Robert L. MORRIS, Plaintiff,

v.

BOSTON EDISON COMPANY,
Defendant.

Civil Action No. 94–11342–MLW.

United States District Court,
D. Massachusetts.

Oct. 7, 1996.

Paul A. Manoff, Boston, MA, for Plaintiff.

Keith B. Muntyan, Morgan, Brown & Joy, Boston, MA, for Defendant.

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

**·MEMORANDUM ON DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT (# 15)**

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, Robert L. Morris (hereinafter "Morris"), filed a complaint in the Superior Court of Suffolk County in the Commonwealth of Massachusetts alleging that retaliation was directed against him consequent to his participation in an investigation of sexual harassment in the workplace in violation of federal and state law, to wit, 42 U.S.C. sections 2000e–3 and 2000e–5 and Mass.Gen.L. ch. 151B, sections 4, 9 and the Civil Rights Act of 1964. In response, the defendant, Boston Edison Company (hereinafter "Edison"), filed an answer to the complaint as well as a notice of removal to the United States District Court for the District of Massachusetts. With discovery complete, Edison has filed a motion for summary judgment seeking the entry of judgment in its favor as a matter of law, which Morris opposes. Following oral argument, this dispositive motion is poised for decision.[1]

### II. THE FACTS

In large measure, the historical facts of this case are undisputed. Morris had been an employee of Edison for eighteen years when he was terminated on December 21, 1993. (Statement of Undisputed, Material Facts # 17 ¶ 2; Plaintiff's Statement Of Material Facts # 20 ¶ 1) From 1979 through the date of his dismissal, the plaintiff held the position of Division Manager for Production Operations Training[2] responsible for the operation and maintenance of the training facilities for the Production Operations Organization as well as the provision of training for Edison's fossil plant operators. (# 17 ¶ 3; # 20 ¶ 1) At least since February of 1989, Morris' immediate supervisor was Joel·Kamya (hereinafter "Kamya"), Vice President of Production Operations, who in turn reported

2. While the defendant refers to this position as "Division Head for Training in the Production Operations Organization", the jobs are one in the same, and the parties are in accord with respect to Morris' duties and responsibilities.

to Cameron Daley (hereinafter "Daley"), Senior Vice President, Power Supply. (# 17 ¶ 20; # 20 ¶ 2)

In November, 1993, Dianne LaRosa (hereinafter "LaRosa"), an office assistant at the facility managed by the plaintiff, made a sexual harassment complaint against her supervisor, Joseph Matte (hereinafter "Matte"), to the president of her local union and to Anne Tavares (hereinafter "Tavares"), Edison's Manager of Equal Employment Opportunity. (# 17 ¶¶ 13, 14; # 20 ¶ 3) LaRosa alleged, inter alia, that Matte had attempted to engage her in discussions of a sexual nature, that he had acted inappropriately in kissing her twice, that he may have been placing anonymous telephone calls to her, and that he might have sexually explicit or pornographic videotapes in his possession at his work station. (# 17 ¶¶ 17, 18; # 20 ¶ 3) As the manager of the facility, Morris was summoned to Tavares' office [3] during her initial meeting with LaRosa and apprised of LaRosa's complaint. (# 17 ¶ 17; # 20 ¶¶ 3, 4) Prior to that time, Morris contends that he was unaware of any difficulties between LaRosa and Matte. (# 20 ¶ 4) [4]

Tavares and Morris determined that it would be best for Matte to report to Tavares' office the following day rather than to the training center. (# 17 ¶ 17) The day after LaRosa lodged her complaint, Matte met with Tavares at her office and was placed on leave pending completion of the investigation into the allegations. (# 17 ¶ 18; # 20 ¶ 5) Morris advised his staff that Matte was on indefinite leave and, in general terms, that an investigation was underway. (# 17 ¶ 18, 21; # 20 ¶ 5)

As the EEO Director of Edison, Tavares was responsible for conducting the investigation into LaRosa's allegations. (# 17 ¶ 18; # 20 ¶ 6) As part of that investigation, Tavares interviewed LaRosa and Matte, as well as other employees in the Training Division, including Robert Motta (hereinafter "Motta"), a skills trainer, and Mary O'Donnell (hereinafter "O'Donnell"), a procedure writer.[5] (# 17 ¶ 20; # 20 ¶ 6) Further, on the evening of December 1, 1993, at the behest of Senior Vice President Daley, members of Edison's security department searched Matte's office and found several videotapes containing sexually explicit material in his desk. (# 17 ¶ 21; # 20 ¶ 8) Morris was present at the facility during the search, and when it was completed, secured Matte's office to prevent access by others as directed by Daley. (# 17 ¶¶ 21, 22; # 20 ¶ 8)

The following day, after hearing from a fellow employee, Mary O'Donnell, that the plaintiff had told her that tapes had been discovered, LaRosa approached Morris in his office to confirm the rumor. (# 17 ¶¶ 23, 24; # 20 ¶¶ 9, 10) The plaintiff responded to LaRosa's inquiry in the affirmative. (Id.) During this conversation, LaRosa was crying and obviously upset. (Id.) According to her deposition testimony, LaRosa told Morris that her co-workers were not talking to her because they blamed her for what was happening to Matte, to which Morris responded that he was sure LaRosa had thought a lot about it prior to lodging a complaint. (# 17, Exh. A, 4 at pp. 61–2) LaRosa also stated that she did not ask Morris to do anything to assist her in dealing with the situation. (# 17, Exh. A, 4 at pp. 62–3) According to his notes, Morris told LaRosa that the employees' reaction was natural in the circumstances, and that he was sure that LaRosa had discussed the situation with her husband both before and after the charges were filed. (# 17, Exh. D at p. 6)

Subsequent to this conversation, LaRosa telephoned Tavares and told her that Morris had confirmed the discovery of the videotapes in the search of Matte's office.[6] (# 17

---

3. Tavares' office was located at 800 Boylston Street in Boston, Massachusetts, whereas the training facility managed by Morris was located in Charlestown, Massachusetts.

4. According to her deposition testimony, LaRosa did not believe that Morris had any knowledge of Matte's actions. (Plaintiff's Exhibits # 21, Exh. C, Deposition of Dianne LaRosa at pp. 31–32)

5. Tavares also interviewed Rick Cross, the union representative to whom LaRosa had made her complaint. (# 17 ¶ 20)

6. Tavares also testified that Motta called her to report that he had heard that security and management personnel had been in the work area the previous evening, that Matte's office had been opened forcibly, and that employees were

¶ 25; # 20 ¶ 12) LaRosa was upset that her co-workers were discussing the situation and also that Tavares was not keeping her apprised about the progress of the investigation. (# 21, Exh. G at pp. 73–6)

Following her telephone conversation with LaRosa, Tavares called Paul Viatkus (hereinafter "Viatkus"), the manager covering for Kamya who was travelling out of town. (# 17 ¶ 26; # 20 ¶ 13) Tavares told Viatkus that Morris had informed LaRosa about the discovery of the videotapes; she also discussed her concern about the effect of piecemeal disclosure of information gathered in the investigation upon morale among employees. (# 17 ¶ 27; # 20 ¶ 13) Viatkus and Tavares agreed to place a joint conference call to Morris, during which they directed the plaintiff not to discuss the ongoing investigation with anyone. (# 17 ¶¶ 27, 28; # 20 ¶¶ 13, 14) Morris maintains that he was the only employee told not to discuss the investigation, and that he was singled out consequent to the revelation he made to LaRosa. (# 20 ¶ 15)

Motta entered Morris' office on the heels of this conference call, and Morris asked Motta if he had spoken with Tavares. (# 17 ¶ 29; # 20 ¶ 16) In response, Motta answered only that the whole thing had gotten out of control, and he left the plaintiff's office. (# 17 ¶ 30; # 20 ¶ 16) At his deposition, Motta testified that he felt under some pressure, and was uncomfortable in Morris' office being questioned by him. (# 17, Exh. A, 6 at pp. 79–80) Shortly thereafter during a telephone call, Motta told Tavares about his conversation with Morris. (# 17 ¶ 30; # 20 ¶ 17) Upset at learning what had transpired between Motta and Morris, Tavares called Viatkus. (# 17 ¶ 30)

According to Viatkus, he, like Tavares, was troubled by Morris' conduct, particularly in that it constituted an immediate and direct violation of the instructions issued during the telephone conference. (# 17 ¶ 30) After attending a meeting with Morris later that same day, Viatkus advised the plaintiff to report to Kamya's office on Monday morning. (Id.)

On Monday December 6, 1993, Viatkus met with Kamya and updated him on what had occurred the previous week, i.e., that Morris had questioned Motta about the investigation in violation of the instructions he had received only a short time before. (# 17 ¶ 31) In Kamya's view, Morris was engaging in a fishing expedition in order to ascertain who at the training facility had been talking to Tavares. (# 17 ¶ 31) Both Tavares and Kamya spoke with Daley who came to understand that Morris had acted in direct violation of Viatkus' directions.[7] (Id.)

After discussing the matter, Daley and Kamya decided to suspend Morris as a result of his conduct until the investigation was completed, and they so informed him. (# 17 ¶ 30; # 20 ¶ 19) Approximately two weeks later, the plaintiff again met with Kamya and Daley at which time Daley notified Morris that his employment was terminated.[8] (# 17 ¶ 33; # 20 ¶ 20) At his deposition, Daley stated that one of the factors considered in reaching the decision to fire Morris was that Morris had demonstrated poor judgment in discussing the investigation with LaRosa. (# 21, Exh. B at p. 36) In fact, Daley testified that there were a number of problems with Morris' performance that culminated in the decision to discharge, for example, discussing the ongoing investigation with Motta in contravention of the direct order not to talk to anyone, the plaintiff had previously pushed a subordinate's hand in an encounter, he had allegedly failed to take responsibility for a decision to discharge a subordinate, he had supposedly allowed his employees to receive overtime when it was inappropriate, etc., but for present purposes, no elaboration of these reasons is required. (See, # 17 ¶¶ 4–12; # 20 ¶¶ 23–25)

For the sake of completeness, as a result of the investigation into LaRosa's complaint, Matte was suspended and demoted, but ultimately chose to resign rather than be sub-

---

very concerned and anxious about what was going on. (# 21, Exh. G at pp. 66–8)

**7.** Both Viatkus and Tavares informed Kamya, and, thereafter, both Kamya and Tavares in-

formed Daley that Motta was disturbed by Morris' questioning.

**8.** Daley concurred with, and acted upon, Kamya's recommendation that Morris be discharged.

jected to these disciplinary measures. (# 17 ¶ 34; # 20 ¶ 22)

## III. SUMMARY JUDGMENT STANDARD

The summary judgment standard in this Circuit is familiar. When considering the propriety of the entry of summary judgment, the Court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court is to examine the materials presented "in the light most favorable to the non-moving party and indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation*, 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1 Cir., 1994).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine" the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*, see also *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff*, 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the Court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary

judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *National Amusements*, 43 F.3d at 735; *Vasapolli*, 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); see also *National Amusements*, 43 F.3d at 735.

Moreover,

> [e]ven in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*Rivera–Cotto v. Rivera*, 38 F.3d 611, 613 (1 Cir., 1994) quoting *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 8 (1 Cir., 1990); see also *Mesnick v. General Electric Company*, 950 F.2d 816, 822 (1 Cir., 1991).

## IV. DISCUSSION

Morris asserts that Edison retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3 [9] and Mass.Gen.L. ch. 151B, § 4(4) [10]. (# 2, ¶ 1) Under these statutes, in order to establish a prima facie case, the plaintiff must show:

---

**9.** Title VII provides, in pertinent part:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e–3(a).

**10.** In pertinent part, the relevant state statute provides that it is unlawful for an employer:

> to discharge, expel or otherwise discriminate against any person because he has opposed any practice forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

Massachusetts General Laws Chapter 151B, § 4(4).

1. that Morris engaged in protected activity known by the alleged retaliator, Edison;

2. that an adverse employment action was taken against Morris by Edison; and

3. that a causal connection exists between the protected activity known by Edison and the adverse action.

*Petitti v. New England Telephone and Telegraph Co.,* 909 F.2d 28, 33 (1 Cir.1990) (interpreting Title VII) citing *Watts v. University of Delaware,* 622 F.2d 47 (3 Cir., 1980); *Hochstadt v. Worcester Foundation,* 425 F.Supp. 318, 324 (D.Mass.), aff'd, 545 F.2d 222 (1 Cir., 1976); *Lewis v. Gillette Co.,* 22 F.3d 22, 24–25 (1 Cir., 1994) *(per curiam)* (interpreting Mass.Gen.L. ch. 151B, § 4(4)). Edison contends that Morris has presented insufficient evidence for a reasonable jury to find that he has met the first and third prongs of this tripartite test, i.e., that Morris' conduct was protected activity and that there was a causal connection between Morris' conduct and his discharge.

Starting with the second contention first, Edison argues that there are no facts to support a jury finding that a causal connection exists between Morris' alleged protected activity and his discharge. This point warrants minimal discussion. Although Edison takes the position that the decision to suspend and ultimately discharge Morris was reached only after he spoke to Motta in violation of an order from his superiors, Daley testified at his deposition that Morris was discharged "in part" because he (Morris) exercised poor judgment when he spoke with LaRosa. This evidence is sufficient to raise a genuine issue of material fact with respect to the causation issue, to wit, the reason why the plaintiff was terminated, in the event that it is determined that Morris engaged in protected activity.

This latter issue is by far the more significant question raised by the defendant's dispositive motion. Under Title VII and Mass. Gen.L. ch. 151B, § 4(4), when a plaintiff alleges that he or she has engaged in activity that enjoys statutory protection, that conduct is categorized as being either "opposition" or "participation". *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1 Cir.1994).

The so-called opposition clause provides that:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter ...

42 U.S.C. § 2000e–3(a).

Similarly, the state statute reads that it is unlawful for an employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practice forbidden under this chapter." Mass.Gen.L. ch. 151B, § 4(4). These statutory provisions create protected activity undertaken internally within a company or an organization. For example, the Second Circuit has written:

> In addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.

*Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2 Cir., 1990).

Similarly, when the plaintiff in the case of *Wall v. AT & T Technologies, Inc.,* 754 F.Supp. 1084 (M.D.N.C.1990), filed a complaint with the defendant's internal Equal Employment Office concerning an incident in 1986, the court held that this type of conduct was "protected activity" and that "Title VII shields a plaintiff from retaliation when she employs informal, nonjudicial means to address discrimination problems." *Id.* at 1092; *See also, Harker v. Utica College of Syracuse University,* 885 F.Supp. 378, 385 (N.D.N.Y. 1995) ("it is clear that voicing complaints about discriminatory employment practices are sufficient to constitute protected activity under Title VII"); *Arzate v. City of Topeka,* 884 F.Supp. 1494, 1503 (D.Kan.1995) ("An informal complaint to management qualifies as protected activity.")

In the present case, the plaintiff does not allege that he has acted in opposition to an

unlawful employment practice. Rather, Morris contends that he has participated in an investigation which is deemed to be a protected activity. In both the federal and state statutes, the opposition and participation clauses are drafted in the disjunctive, indicating that there is a distinction to be made in the actions prohibited by each. Put another way, the activity protected under each clause differs.

The plaintiff's claim under state law can be readily addressed. The participation clause of Mass.Gen.L. ch. 151B, § 4(4) provides that it is unlawful for an employer "to discharge, expel or otherwise discriminate against any person ... because he has filed a complaint, testified or assisted in any proceeding under section five." [11] The direct reference to section five of chapter 151B serves as a limitation on the breadth of this portion of the statute, prohibiting only discrimination by an employer against an employee for actions taken, i.e., filing a complaint, testifying or assisting, in statutory governmental proceedings. In other words, to use the terms coined by the parties, in contrast to the opposition clause, by its terms the participation clause of the Massachusetts law applies solely to external or formal as opposed to internal or informal investigations and proceedings. Given this plain statutory construction, where Morris alleges only that he assisted or participated in an internal Edison investigation, he has no claim under Mass. Gen.L. ch. 151B, § 4(4).

The participation clause of Title VII provides, in pertinent part, that:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

Like its state counterpart, this federal statutory provision addresses actions relating to investigations, proceedings, or hearings "under this subchapter", subchapter 6, referring to governmental statutory proceedings.

The vast majority of reported cases deal with plaintiffs who have suffered retaliation once they have filed a complaint. In *Hochstadt v. Worcester Foundation,* 545 F.2d 222 (1 Cir.1976), the court stated that "... section 704(a) [12] clearly does protect an employee against discharge for filing complaints in good faith before federal and state agencies and for registering grievances through channels appropriate in the particular employment setting." *Hochstadt,* 545 F.2d at 230–31. More recently, in *Wyatt v. City of Boston,* 35 F.3d 13 (1 Cir.1994), the plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (hereinafter "MCAD"). The plaintiff argued that he had been retaliated against for opposing what he viewed as sexual harassment and for filing the claim with MCAD. The court held that the plaintiff satisfied the prong of engaging in protected conduct when he filed the complaint. *Id.* at 16. Because the plaintiff in the case at bar did not file a complaint and as a consequence did not suffer retaliation, Morris does not fall under this category.

Other cases have held that protected conduct may arise when an employee testifies before or otherwise participates in a state or federal EEO agency investigation of another employee's charge of discrimination.[13] Courts have also held that an employee cannot be subject to retaliation for refusing to participate in an employer's employment discrimination investigation. For instance, in *Smith v. Columbus Metropolitan Housing Authority,* 443 F.Supp. 61 (1977), an employee refused to participate in a discrimination claim. *Id.* at 62. The employee decided not to assist the employer with the claim and

---

**11.** Although dubbed a "participation clause", it is significant to note that the state statutory provision does not include the word "participate".

**12.** Section 704(a) of Title VII was amended to Title 42 U.S.C. § 2000e–3 (1964) in 1982.

**13.** In *Crawford v. Roadway Express,* 485 F.Supp. 914 (W.D.La.1980), an employee was harassed after he testified at an EEOC hearing regarding charges filed by other employees.

See also *EEOC v. IUOE, Locals 14 and 15,* 438 F.Supp. 876 (S.D.N.Y.1977), in which witnesses who testified at an EEOC trial engaged in protected conduct.

refused to sign an affidavit which the employer had drafted. *Smith*, 443 F.Supp. at 62. The main question presented in this case was "whether demoting plaintiff because she refused to make the sworn statement was demoting her because she 'assisted or participated in any manner' in the pending OCRC (Ohio Civil Rights Commission) investigation." *Id.* at 63. The court expressed the view that "the question [was] a difficult and unsettled one under the Act ..." *Id.* It was concluded that "the broad statutory prohibition against retaliation for participating in any manner in a pending investigation includes the retaliation directed toward the plaintiff ..." *Id.* Moreover, the court wrote:

> that whether an employee decides to assist the charging party, or refuses to assist the respondent employer, the employer may not retaliate against the employee, because this decision of the employee constituted participation in an investigation or proceeding under Title VII.

*Smith*, 443 F.Supp. at 64.

In a 1994 law review article examining the Title VII retaliation action, the types of conduct covered by the participation provision were described as follows:

> An employee who files charges with the EEOC or with a similar states agency is protected by § 704(a) protection.
>
> \*   \*   \*   \*   \*   \*
>
> In addition to protecting an employee who files charges, § 704(a) also protects employees who participate in a Title VII investigation, proceeding, or hearing on their own behalf or on behalf of another. An employee is protected if the employee encourages co-workers to enforce their Title VII rights, refuses to sign an inaccurate affidavit on behalf of an employer, testifies on behalf of a co-worker, aids the state or federal investigating authority, participates in a conciliation meeting on behalf of a co-worker, submits affidavits on behalf of a co-worker to the EEOC, or submits non-confidential documentary evidence to an agency investigating a discrimination com-

plaint. An employer is liable for retaliation if the employer promulgates a rule prohibiting employees from cooperating in Title VII investigations without prior supervisory approval, coercively interviews employees under circumstances that could render their testimony involuntary, or fails to prevent harassment of an employee by co-workers who give the employer notice that they intend to engage in harassment of the employee.

R. Bales, *A New Standard For Title VII Opposition Cases; Fitting The Personnel Manager Double Standard Into A Cognizable Framework*, 35 S.Tex.L.Rev. 95 (1994) (footnotes omitted).

In sum, all the activity described as being protected under the participation clause relates to actions taken in outside, formal statutorily created proceedings.

The phrase "participated in any manner" appears in the federal statute, but not in the Massachusetts law. At first blush, the term appears to be so broad as to be amorphous; how is it to be interpreted? By construing the participation clause, in counterpoint to the opposition clause, as being limited to actions taken with respect to hearings or proceedings established under the statute, i.e., external EEOC investigations, proceedings or hearings, definition is given to the phrase "participation in any manner" so as to render it meaningful. Moreover, with this construction, the protection afforded by the federal participation clause dovetails with that provided by the state statute.

The plaintiff in the instant case contends that he participated or assisted in the investigation of the sexual harassment complaint by answering in the affirmative when LaRosa asked him if videotapes had been discovered in Matte's office. Such conduct in an internal company investigation quite simply is not protected activity under the federal participation clause of 42 U.S.C. § 2000e-3(a) as construed by the Court in that it was not action taken relating to any "investigation, proceeding, or hearing under this subchapter."[14]

---

14. Although I need not decide the issue, I have great doubts whether Morris' conduct can be

said to rise to the level of "participation" in an

In the absence of any other alleged conduct that would be covered by the relevant statutory provisions, the plaintiff has failed to provide any evidence to establish the first prong of his prima facie case, to wit, that he engaged in protected activity. Given this failure, the defendant is entitled to the entry of judgment as a matter of law.

## V. CONCLUSION

For all the reasons stated, the Court, on September 30, 1996, entered an Order allowing Defendant's Motion For Summary Judgment (# 15). Judgment shall enter for the defendant.

investigation had there been proceedings pursuant to the "subchapter."