Jesep v. NE Health Care Quality Found 04-CV-77-JD    04/27/05

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Peter Paul Jesep

    v.                                  Civil No. 04-cv-77-JD
                                        Opinion No. 2005 DNH 073
Northeast Health Care
Quality Foundation and
Robert Aurilio


O R D E R


Peter Paul Jesep brought claims under Title VII of the Civil Rights Act of 1964 and New Hampshire law against his former employer, Northeast Health Care Quality Foundation, and his supervisor, Robert A. Aurilio.  His Title VII claim against Aurilio and his wrongful termination claim were previously dismissed.  The defendants now move for summary judgment on the remaining claims, and Jesep objects.


Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See id. at 255.

## Background[1]

The Northeast Health Care Quality Foundation ("NHCQF") is a federally-mandated peer review organization for New Hampshire, Maine, and Vermont that is responsible for ensuring the integrity of the Medicare Trust Fund with respect to the quality of care and beneficiaries' rights. The NHCQF operates through contracts with the Centers for Medicare and Medicaid Services, which was formerly the Health Care Financing Administration ("HCFA"). Robert Aurilio has been the executive director of the NHCQF since 1982.

---

[1]The background information is taken from the properly supported factual statements submitted by the parties. To the extent Jesep relies on allegations in his complaint, which is not a verified complaint, those statements are not properly supported and are disregarded. See Fed. R. Civ. P. 56(c); LR 7.2(b)(2); Anderson, 477 U.S. at 246 ("In opposing summary judgment, the nonmoving party may not rest upon the mere allegations or denials of the pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial.") (internal quotations, citation, and alteration omitted).

2

NHCQF's 1996 to 1999 contract with the HCFA required NHCQF to have an employee designated to perform communications functions. Jesep was hired by Aurilio in September of 1995 to fulfill that requirement. When he was hired, his position was Public Relations Director, although his business cards referred to him as Director of Communications. Jesep's job activities and description changed during his employment to "Director of Public Affairs and Government Relations." NHCQF and HCFA entered a new contract in 1999, covering the period of 1999 to 2002, that no longer required NHCQF to have an employee designated to perform communications functions. Instead, the new contract stated that communications, marketing, and outreach activities were appropriate only to the extent they supported NHCQF's purpose of improving the quality of care, protecting the integrity of the trust fund, or protecting beneficiaries.

Aurilio was Jesep's direct supervisor. In the course of his work at NHCQF, Jesep heard Aurilio make inappropriate comments, including anti-Semitic, racist, and sexual remarks, on a "pretty regular" basis. In April of 2000, another NHCQF employee, Brian McClellan, made a complaint to the NHCQF board of directors in which he alleged that Aurilio had made remarks of a sexual nature to him. He identified Jesep, along with other employees, as witnesses to Aurilio's remarks. McClellan let Jesep and the other employees know that he had identified them as witnesses in

3

his complaint. Aurilio was notified of the complaint in April by the president of the board, who also told him that he should be less friendly with the staff and should be more removed. Aurilio also received a copy of the complaint in April.

The board engaged a lawyer, Thomas Flygare, to investigate McClellan's complaint. Flygare interviewed Jesep in May of 2000 and indicated that he would interview the other employees who were named as witnesses. The investigation concluded in late June or early July of 2000. McClellan's employment with NHCQF was terminated at about the same time. Jesep does not know and the record does not provide information about the outcome of the investigation or the relationship between McClellan's termination and the investigation.

After his participation in the investigation of McClellan's complaint, Jesep noticed that Aurilio's communication with him was less frequent and less friendly. Aurilio explains that his contact with Jesep, along with all of the NHCQF employees, changed in response to the directive from the board that he be less friendly with the staff and more removed. He also states that his business relationships with NHCQF employees remained the same.

Jesep noticed that his relationships with other employees also changed. He sensed a growing coolness or aloofness, and certain colleagues told him to stay away from them. Jesep states

4

that another colleague told him that everyone knew Jesep was being held accountable for participating in the investigation of McClellan's complaint. One colleague confronted Jesep about his involvement in McClellan's complaint and gave him the cold shoulder thereafter. Jesep interpreted the changes in his relationships as Aurilio's attempt to isolate him.

Jesep also remembers that he was discouraged from using the NHCQF secretary for his work and that he was not asked to participate in the eighteen-month contract evaluation although he had participated in a similar review of the previous contract. He states that he was not included in management team meetings after the fall of 2000, although he had participated in those meetings in the past. He acknowledges, however, that those meetings were held only sporadically. Jesep noticed that framed memorabilia of his achievements that hung in a conference room were removed before the eighteen-month contract evaluation was held in that room in early 2001.

The defendants point out that Jesep did not receive any negative notes or comments from Aurilio and that he has no personal knowledge that Aurilio directed other employees to treat Jesep differently. After Jesep was interviewed in connection with McClellan's complaint, Aurilio publicly praised Jesep for his work on a project and celebrated his five-year anniversary with NHCQF.

5

NHCQF's contract with HCFA for 1999 to 2002 was subject to eighteen-month review which occurred in March and April of 2001. Before the review, Aurilio asked Jesep to prepare a memorandum about his legislative activities over the last eighteen months. Aurilio reviewed Jesep's work and decided, based on his own knowledge of Jesep's activities and Jesep's report about his legislative activities, that his position could no longer be justified under the HCFA contract. He notified Jesep of his decision on March 28, 2001, and Jesep was terminated on April 6, 2001. NHCQF did not hire anyone to fill Jesep's position after he was terminated.

## Discussion

Jesep alleges that NHCQF violated Title VII by terminating his employment in retaliation for his opposition to unlawful employment practices and for his participation in an internal sexual harassment investigation.[2] He alleges that NHCQF and Aurilio violated RSA 354-A by terminating his employment because of his participation in the internal investigation and "by otherwise intimidating him and ultimately causing him to be terminated from his employment in retaliation for his participation in an act protected by N.H. RSA 354-A:7V." He also

---

[2]Jesep's Title VII claim against Aurilio has been dismissed.

6

alleges that his employment was terminated in breach of his contract and that the defendants' actions constitute intentional infliction of emotional distress.[3]  The defendants, NHCQF and Aurilio, seek summary judgment on all of Jesep's claims.

A.  Retaliation

"Under Title VII of the Civil Rights Act of 1964, . . . 42 U.S.C. § 2000e-3(a), it is unlawful 'for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice under [Title VII], or because the [employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'"  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269 (2001) (quoting § 2000e-3(a)).  RSA 354-A:19 similarly proscribes retaliation by employers.  To establish a prima facie case of discriminatory retaliation, "a plaintiff must show that (i) she undertook

_____

[3]Although Jesep, who is represented by counsel, also included a claim for negligent infliction of emotional distress in his complaint, he failed to address that claim in response to the defendants' motion for summary judgment.  Instead, Jesep states that his claims consist of discriminatory retaliation, breach of contract, and intentional infliction of emotional distress.  Therefore, it appears that he is no longer pursuing his claim for negligent infliction of emotional distress, which, as the defendants assert, is barred by RSA 281-A:8,I (1999) (amended Aug. 2001).  See Karch v. BayBank FSB, 147 N.H. 525, 529-30 (2002).

7

protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." <u>Noviello v. Boston</u>, 398 F.3d 76, 88 (1st Cir. 2005); <u>Madeja v. MPB Corp.</u>, 149 N.H. 371, 378 (2003) (addressing RSA 354-A:19 and relying on federal law under Title VII).[4] If the plaintiff completes the three steps necessary to make a prima facie case, the defendant must articulate a legitimate, non-retaliatory, reason for the adverse employment action, which the plaintiff must show is a pretext for retaliation. <u>King v. Hanover</u>, 116 F.3d 965, 968 (1st Cir. 1997).

1. <u>Protected conduct.</u>

Protected conduct encompasses both opposition to unlawful employment practices and participation in Title VII proceedings. See <u>King v. Hanover</u>, 116 F.3d 965, 968 (1st Cir. 1997). Jesep contends that he engaged in protected conduct, within the meaning of the statutes, by opposing Aurilio's inappropriate remarks and through his participation in the investigation of McClellan's complaint of sexual harassment. The defendants assert that internal investigations, such as the investigation of McClellan's

---

[4]Because the New Hampshire Supreme Court relies on federal case law to interpret RSA 354-A and the parties have not argued that there are any material differences between the claims under § 2000e-3(a) and RSA 354-A, no distinction will be made between the two claims for purposes of deciding the present motion.

8

complaint, are not protected activity under Title VII and RSA 345-A.

The First Circuit has not addressed the question of whether participation in an internal investigation of a complaint that raises Title VII issues is protected conduct under 2000e-3(a). Most courts have concluded that participation in an internal investigation by an employer, in the absence of a complaint to the Equal Employment Opportunity Commission, is not protected conduct. See, e.g., Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 543 (6th Cir. 2003) (citing cases); Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1997); Jute v. Hamilton Sunstrand Corp., 321 F. Supp. 2d 408, 415 (D. Conn. 2004) (citing cases); see also Morris v. Boston Edison Co., 942 F. Supp. 65, 71 (D. Mass. 1996). In contrast, however, protected opposition activity includes participation in an employer's grievance procedure or an internal investigation to oppose an unlawful practice. See, e.g., Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004); Kubicko, 181 F.3d at 551; Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998); Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

Following the reasoning of the courts that have addressed the issue, Jesep's participation in NHCQF's internal investigation of McClellan's sexual harassment complaint is not

9

protected conduct under the participation clause of § 2000e-3(a). However, it may be inferred from the undisputed facts in this case, that Jesep opposed Aurilio's practice of making remarks of a sexual nature to McClellan and that his participation in the investigation was part of his opposition to Aurilio's behavior. Therefore, the record provides a triable issue as to whether Jesep's cooperation with the investigation was protected conduct under the opposition clause of § 2000e-3(a) and RSA 354-A:19.

### 2. Adverse employment action.

Jesep alleges in his complaint that his employment with NHCQF was terminated in retaliation for his opposition to Aurilio's practice of making remarks of a sexual nature to McClellan. In opposing summary judgment, Jesep also asserts that NHCQF employees, including Aurilio, treated him differently because he opposed Aurilio's remarks to McClellan, which lead to his termination.[5] The defendants do not challenge Jesep's

---

[5] Although a retaliatory hostile work environment may constitute adverse employment action, the abuse or hostility must be so severe and pervasive as to change the conditions of employment. Noviello, 398 F.3d at 89-90, 93. The circumstances Jesep describes were not sufficiently pervasive or severe to create a hostile work environment. See, e.g., id. at 92; Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir. 2003); Koseireis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002). In any case, the parties focus on the termination of Jesep's employment as the adverse employment action at issue in

assertion that he suffered adverse employment action when his employment was terminated.

### 3. Causal connection.

Jesep must prove that the adverse employment action was causally related to his protected activity. See Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003). In other words, he must show that his employment was terminated because he opposed Aurilio's treatment of McClellan. The defendants assert that no causal connection exists.

It is undisputed that no direct evidence exists to support a connection between Jesep's support of McClellan's complaint and his termination. The defendants point out that too much time elapsed between Jesep's involvement in McClellan's complaint in April and May of 2000 and his termination in April of 2001 to support a temporal connection. See, e.g., Breeden, 532 U.S. at 273; Benoit, 331 F.3d at 175; Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir. 2003); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 262 (1st Cir. 1999). Jesep argues that the changed treatment he received from Aurilio and his fellow employees after he supported McClellan's complaint provides indirect evidence

---

this case, making any issue of a hostile work environment immaterial.

that his later termination was causally related to his protected activity.

Jesep contends that Aurilio's written communications with him were less frequent and less friendly after April of 2000 and that his direct contact with Aurilio also became less frequent and then ceased. It is undisputed, however, that following McClellan's complaint, Aurilio received a directive from the NHCQF board of directors that he was to change his behavior in dealing with his staff to be less friendly and more removed. Aurilio testified that he changed his informal relationship with Jesep, along with all of his staff, in response to that directive. Jesep's efforts to suggest that Aurilio only changed his relationships outside of the work setting are not persuasive.

Jesep also contends that his fellow employees were less friendly and told him they did not want to associate with him. He argues that their changed behavior was the result of Aurilio's efforts to isolate him. He offers no evidence of any connection between Aurilio and the comments made by his fellow employees. Nevertheless, an inference might be drawn that the other employees believed that Jesep was no longer in favor at NHCQF. Although that is a weak basis for the causal connection element, it might be enough to support a factual issue for purposes of avoiding summary judgment on the prima facie case.

12

4. Proof of retaliation.

Assuming that Jesep has made a prima facie case, to support their motion, the defendants must articulate a legitimate reason for terminating him. They assert that Aurilio terminated Jesep because his position could not be justified under NHCQF's 1999 to 2002 contract with HCFA.

The parties do not dispute that NHCQF's 1999 to 2002 contract did not require an employee to perform communications functions, as the previous contract did. They do not dispute that the 1999 to 2002 contract permitted communications, marketing, and outreach activities only to the extent that those activities could be justified to fulfill the purposes of improving the quality of care, protecting the integrity of the trust fund, and protecting beneficiaries. They also do not dispute that the 1999 to 2002 contract was subject to an eighteen-month review in March and April of 2001.

The defendants contend that Aurilio reviewed Jesep's work as part of his preparation for the eighteen-month contract review. He decided to terminate Jesep's employment because he could not justify his position under the terms of the 1999 to 2002 contract. The defendants state that they have not hired anyone to replace Jesep.

Jesep contends that the defendants' explanation is not credible because they waited for eighteen months after the new

13

contract went into effect to terminate him.  He asserts that Aurilio and other NHCQF employees treated him differently after he participated in the investigation of McClellan's complaint, suggesting that his termination was motivated by retaliation for that activity, contrary to the asserted reason.  Jesep also points to some inconsistencies in Aurilio's deposition testimony about whether Jesep was asked to report on his work activities and asserts that he, as Director of Public Affairs and Government Relations, had different job responsibilities than those he fulfilled initially, as Director of Communications.

That Jesep was not terminated for eighteen months after the new contract went into effect does not undermine the defendants' reason for his termination.  It is undisputed that his position was reviewed as part of the eighteen-month contract review, a process that Jesep acknowledges had also occurred under the previous HCFA contract.  Jesep did not provide a description of his activities to show, contrary to Aurilio's assessment, that his job was justifiable under the new contract terms.  Whether Aurilio asked him for a complete review of his activities or only for his legislative activities does not provide a material factual dispute because, as his supervisor, Aurilio was familiar with his work.  Further, it is undisputed that NHCQF has not hired anyone in the intervening four years to fill Jesep's position or to perform the same activities.

14

It is also undisputed that other employees were interviewed during the investigation into McClellan's complaint. Jesep has not shown or even suggested that those employees were terminated or subjected to retaliation nor has he shown that he was the only witness who supported McClellan's charges.[6] Given the defendants' legitimate explanation for his termination, Jesep's evidence that he was treated differently after his support for McClellan's complaint does not provide sufficient evidence that would permit a jury to find that his employment was terminated in retaliation for his conduct.

"For a retaliation claim to survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000). Jesep has not carried his burden of showing that a trialworthy issue exists as to whether he was terminated in retaliation for his support of McClellan's complaint. Therefore, the defendants are entitled to

---

[6]In the context of his intentional infliction of emotional distress claim, Jesep refers to a complaint filed with the EEOC in October of 2000 by another NHCQF employee, charging that she was terminated in retaliation for her complaints of a sexually hostile work environment. The referenced exhibit shows that the EEOC found no statutory violation.

15

summary judgment on Jesep's claims under Title VII and RSA 354-A, Counts I and II.

B.  Breach of Contract

The parties agree that Jesep was hired as an at-will employee.  Jesep alleges, however, that the employee handbook and other documentation given to him during his employment at NHCQF provided an express or implied employment contract that NHCQF breached by terminating him "in bad faith, retaliation and malice."  Compl. Count IV.  The defendants move for summary judgment on the grounds that Jesep was an employee at will and that no employment contract existed that modified that relationship.

Under New Hampshire law, in the absence of an agreement as to the duration or expiration of employment, both the employer and the employee are free to terminate the employment relationship at any time.  Porter v. City of Manchester, 151 N.H. 30, 37 (2004); Dillman v. New England Coll., 150 N.H. 431, 434 (2003).  That status is known as employment at will.  Id.  An at-will employment relationship may be modified by the terms and conditions provided in an employer's policy statement, handbook, or manual.  See Butler v. Walker Power, Inc., 137 N.H. 432, 435-

16

36 (1993); <u>Panto v. Moore Bus. Forms, Inc.</u>, 130 N.H. 730, 737-39 (1988).  The meaning of an employment agreement is a legal question for the court to decide.  <u>Butler</u>, 137 N.H. at 435.

Jesep received the NHCQF employee handbook at the beginning of his employment and signed an acknowledgment that he received the handbook, the NHCQF personnel policies, and the confidentiality policy.  He understood, based on his legal training, that he was an at-will employee and that he could be discharged at any time and for any reason that was not unlawful.[7] He also understood that the NHCQF could eliminate his position if it no longer fulfilled the NHCQF mission.  Jesep acknowledged at his deposition that the handbook stated that his employment was considered to be at will and that either party could terminate the relationship at any time for any lawful reason.

Jesep did not submit copies of any of the documents that he contends altered his employment status.  Instead, he relies on the allegations in his complaint and his deposition testimony to describe those documents.  As such, Jesep has not provided a sufficient record for the court to interpret the meaning of the employment documents on which he relies.

_____

[7]Jesep graduated from law school and passed at least one bar examination but did not practice law.

17

Even if the court were to rely on Jesep's descriptions of the pertinent documents, without the opportunity to review the documents themselves, he fails to show that NHCQF modified his employment status. Jesep contends that the employee manual stated that staff would not be retaliated against if they reported sexual harassment and that it contained an anti-harassment policy.[8] He argues that the defendants failed to comply with that policy and that their failure constitutes breach of contract. Because the at-will provision in the handbook included a provision that an employee would not be terminated for unlawful reasons, which would be implied even if it were not explicit in the handbook, the anti-retaliation and anti-harassment policies do not modify the at-will relationship.[9]

Jesep also argues in support of his breach of contract claim that he was valuable to the organization and that he performed his job in a satisfactory manner. He states that Aurilio had told him in early 2000 that his position would be easy to justify to the HCFA and was secure. However, neither stellar performance nor informal promises of continued employment change the at-will

[8]He also states that the documents lacked any condition that his employment was contingent on the HCFA contract. Because his employment was at will, the lack of a condition or term in the handbook does not alter his employment relationship.

[9]Jesep's wrongful discharge claim was previously dismissed.

18

status of employment.  <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 426-27 (1st Cir. 1996).

Therefore, the defendants are entitled to summary judgment on Jesep's breach of contract claim.

C.  <u>Intentional Infliction of Emotional Distress</u>

Jesep alleges that the "intentional actions of Robert A. Aurilio, individually and as an officer of NHCQF, in terminating Mr. Jesep's employment in retaliation for having opposed unlawful employment practices and participating in an internal sexual harassment investigation . . . , caused Mr. Jesep to suffer emotional distress and mental suffering."  Compl. ¶ 71.  He also alleges:  "NHCQF, through its agents, in terminating Mr. Jesep's employment in retaliation for having opposed unlawful employment practices and participating in an internal sexual harassment investigation . . . caused Mr. Jesep to suffer emotional distress and mental suffering."  Compl. ¶ 72.  As such, Jesep's intentional infliction of emotional distress claim is based on his termination.

The defendants move for summary judgment on the grounds that the workers' compensation statute, RSA 281-A:8,I(a), precludes the claim as to NHCQF for employment-related conduct.  They also content that termination is insufficient to support a claim of

19

intentional infliction of emotional distress. In response, Jesep ignores the workers' compensation statute and argues that Aurilio's actions constituted intentional infliction of emotional distress.

At the time in question in this case, RSA 281-A:8,I(a) barred an employee's claim against his employer for intentional infliction of emotional distress based on conduct or circumstances during his employment. See Karch, 147 N.H. at 531; see also Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 6 (1st Cir. 2002). In Konefal v. Hollis/Brookline Co-op. Sch. Dist., 143 N.H. 256, 260 (1998), the court held that termination of employment alone was insufficient to support a claim of intentional infliction of emotional distress. Therefore, NHCQF is entitled to summary judgment on Jesep's intentional infliction of emotional distress claim.

Even if Jesep had alleged a claim of intentional infliction of emotional distress against Aurilio, he would face a difficult standard to show a trialworthy issue on that claim. To prove intentional infliction of emotional distress, Jesep would have to show that Aurilio's remarks constituted extreme and outrageous conduct which either intentionally or recklessly caused him emotional distress. Morancy v. Morancy, 134 N.H. 493, 495-96 (1991). Extreme and outrageous conduct, in this context, must be

20

"'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 511 (1st Cir. 2002) (quoting Restatement (Second) of Torts § 46, cmt. d (1977) and citing Konefal, 143 N.H. at 260).

In support of his claim, Jesep points to his deposition testimony where he testified that Aurilio made anti-Semitic, racial, and sexist remarks which made him uncomfortable. He also testified in his deposition that Aurilio made inappropriate sexual remarks about McClellan and made sexist and racist remarks in the presence of a female employee. Jesep does not suggest that any of Aurilio's remarks were aimed at him or were said for the purpose of making him uncomfortable. He also stated in his deposition that he never made any complaint about Aurilio's conduct, and he does not show that Aurilio was aware that he was uncomfortable about the remarks. Aurilio's perceived aloofness does not constitute intentional infliction of emotional distress.

Under these circumstances, no issue of material fact exists to support Jesep's claim of intentional infliction of emotional

21

distress against Aurilio.  Therefore, Aurilio is entitled to summary judgment on that claim.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (document no. 13) is granted.  Jesep's Title VII claim against Aurilio and his wrongful discharge claim were previously dismissed, and summary judgment resolves all of the remaining claims in favor of the defendants.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 27, 2005

cc:  Edward M. Kaplan, Esquire
     Jennifer A. Lemire, Esquire