# United States Court of Appeals
## For the First Circuit

No. 04-1719

CHRISTI NOVIELLO,

Plaintiff, Appellant,

v.

CITY OF BOSTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Cyr, Senior Circuit Judge.

Robert S. Mantell, with whom Kevin G. Powers and Rodgers, Powers & Schwartz LLP were on brief, for appellant.
Karen A. Glasgow, Assistant Corporation Counsel, with whom Merita A. Hopkins, Corporation Counsel, was on brief, for appellee.

February 16, 2005

**SELYA**, <u>Circuit Judge</u>. This discrimination case, brought under both federal and state law, involves charges of sexual and retaliatory harassment. Faced with a plethora of issues, the district court entered summary judgment for the defendant. On appeal, we must sort out which of the plaintiff's claims are timely; address whether her timeous claims for retaliatory harassment, cast in the form of a hostile work environment, are legally cognizable and sufficiently supported; grapple with her one timely claim of sexual harassment, also cast in the form of a hostile work environment; and discuss various aspects of the case relating to employer liability. After careful consideration of these variegated issues, we conclude (i) that the district court erred in granting summary judgment on the retaliation claims, as those claims are timely, cognizable, and supported by sufficient evidence, but (ii) that the district court correctly entered summary judgment on the sexual harassment claims: despite the attempt to recast them in a hostile work environment format, the state-law claim is time-barred and its federal analogue runs afoul of an inexpugnable affirmative defense — the employer's swift, effective, and non-negligent response to the underlying incident. Accordingly, we vacate in part, affirm in part, and remand for further proceedings.

## I.  BACKGROUND

Because this appeal follows a grant of summary judgment, we rehearse the facts in the light most favorable to the nonmoving party (here, the plaintiff), consistent with record support. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). That approach entails, among other things, giving the nonmovant the benefit of all reasonable inferences that those facts will bear. Id.

### A.  The Facts.

While on the job on September 11, 1999, plaintiff-appellant Christi Noviello, a parking enforcement officer for the city of Boston, was riding in a city-owned van with her immediate superior, José Ortiz. After first announcing his intentions, Ortiz forcibly unhooked the plaintiff's brassière, ripped it from her body, hung it on the van's outside mirror, and bellowed a crude sexual remark to a fellow employee on the street. Over the next few days, the plaintiff reported the incident to a number of municipal hierarchs. They promptly investigated the matter, suspended Ortiz a week after the incident, and ultimately cashiered him.

Soon after Ortiz's banishment, coworkers began to subject the plaintiff to sundry indignities, or, in the words of the employees themselves, to "bust[] her chops." The record contains evidence of the following incidents (the plaintiff recounts others,

-3-

but we have omitted those that lack any conceivable probative value):

- On October 5, 1999, Barbara DiGirolamo accused the plaintiff of throwing a tampon at a coworker. The charge fizzled out after several witnesses attested to its falsity.

- On October 26, 1999, a coworker shouted that the plaintiff was the "scum of the earth." Another loudly proclaimed, in reference to the plaintiff, "I smell a rat, do you smell a rat?" Yet another lamented that the parking enforcement officers' "good" supervisor had been drummed out of office. The plaintiff complained to a senior supervisor, Irene Landry, who took no action.

- On December 8, 1999, a new employee told the plaintiff that although he had no problem with her, other coworkers had advised him to "stay away" because she was "trouble."

- On December 9, 1999, the entire department ostracized the plaintiff during a holiday party. Consequently, she sat alone for two hours. A deputy commissioner saw her sitting alone, acknowledged the ostracism, and suggested that she change her shift. The plaintiff took the advice, but the harassment continued.

- On December 16, 1999, DiGirolamo informed the plaintiff that all personnel on her shift had to take their dinner breaks separately. The plaintiff later learned that this was not true and that she was the only person who had been told to eat alone.

- On December 21, 1999, Bernadette Gilardi announced in front of the plaintiff that she would be taking up a

collection for Ortiz. She proceeded to do so during working hours.

- On December 23, 1999, the plaintiff attended a holiday party on the department's premises. The collection for Ortiz was in full flower. Coworkers waved the money they had amassed in the plaintiff's face, crowing "look how much money we have collected!" One of the plaintiff's superiors, Kathy O'Brien, advised her to "go to the office" about the harassment. There is no evidence, however, that O'Brien intervened to stop the ongoing conduct.

- On December 30, 1999, the plaintiff met with a high-level supervisor, Kathleen Moccia. She described the toll that the harassment was taking on her and asked Moccia why management was tolerating the harassment. Moccia did not intervene. Moreover, she stated that she did not think that the harassment would stop; rather, she forecast that it would become "ten times worse" with the plaintiff's recent shift change.

- In January of 2000, a tow truck driver told the plaintiff that Gilardi had begun circulating a petition urging management to dismiss the plaintiff, but that he had refused to sign it.

- During a snowstorm that month, Gilardi refused to pick up the plaintiff from her route. Although that refusal, duly reported, was in derogation of departmental policy, there is no evidence that Gilardi was sanctioned or punished in any way.

On March 6, 2000, the plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) and the

-5-

federal Equal Employment Opportunity Commission (EEOC). The harassment nonetheless persisted. Two examples follow:

- In February of 2001, the plaintiff approached a van that was used to transport parking enforcement officers to their posts. Gilardi was at the wheel. When she saw the plaintiff approach, she closed the van's door, ignored the plaintiff's tapping on the window, and drove away, nearly striking the plaintiff. The plaintiff reported the incident and Gilardi admitted that she had seen the plaintiff but nonetheless had pulled away. There is no evidence that Gilardi was disciplined for this conduct.

- In March of 2001, Gilardi told a coworker, in reference to Ortiz's firing, that the plaintiff's "payday" was drawing near.

The plaintiff alleges that, as a result of this steady stream of what she characterizes as retaliatory harassment, she lost weight, experienced nightmares and panic attacks, became anxious at work, and was forced to seek medical care.

## B. **Travel of the Case**.

On October 16, 2002, the plaintiff requested withdrawal of her administrative complaint in order to pave the way for the institution of suit. The MCAD obliged and the plaintiff commenced a civil action against the city in a Massachusetts state court. Her complaint, filed on November 1, 2002, charged the city with violations of Mass. Gen. Laws ch. 151B, § 4. On April 25, 2003, the plaintiff received a right-to-sue letter from the EEOC. One

month later, she amended her state court complaint to include Title VII claims. See 42 U.S.C. §§ 2000e-2, e-3. At that point, the city removed the case to the federal district court. See 28 U.S.C. §§ 1331, 1441.

In due course, the city moved for summary judgment under Fed. R. Civ. P. 56, arguing (i) that most of the plaintiff's claims under chapter 151B were time-barred; (ii) that those which remained were not actionable; (iii) that as to the federal retaliation claims, the evidence, even when interpreted in the light most favorable to the plaintiff, did not reveal any actionable conduct; and (iv) that the city could not be held liable for Ortiz's behavior because it had taken prompt and effective remedial action. The plaintiff opposed the motion. Ruling ore sponte, the district court granted summary judgment for the city. The court concluded that there was no timely sexual harassment claim under chapter 151B and that the city's response to the Ortiz incident foreclosed any sexual harassment claim under Title VII. As to the retaliation claims, the court acknowledged that, viewing the proof in the requisite light, the plaintiff had been subjected to a "series of distasteful, unpleasant, non-empathetic acts . . . by a series of subordinate officials." Nevertheless, the court concluded that the retaliation claims must fail because none of the individual incidents was an "adverse employment action[]" that bore directly

-7-

upon the terms and conditions of the plaintiff's employment.  This timely appeal followed.

## II.  ANALYSIS

The plaintiff's suit implicates both federal and state anti-discrimination and anti-retaliation statues.  It requires us to confront — and resolve — two questions of first impression in this circuit.

As framed, all of the plaintiff's claims are dependent upon her allegation that the city tolerated a hostile work environment.[1]  In general, a plaintiff may recover on such a theory when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted); accord O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001); Muzzy v. Cahillane Motors, Inc., 749 N.E.2d 691, 694 (Mass. 2001).  The plaintiff's hostile work environment claims are of two types.

Most hostile work environments are bred from an ongoing series of harassing incidents.  The plaintiff's claim of a hostile

---

[1]This is an odd configuration for the claim that Ortiz, on a single occasion, sexually harassed the plaintiff.  We assume that the plaintiff attempts to force the harassment claim into that mold in an effort to elude the limitations question under chapter 151B.  See infra Part II(B).

work environment, based singularly upon Ortiz's assault, is not of this ilk. However, a single act of harassment may, if egregious enough, suffice to evince a hostile work environment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (Title VII); Gnerre v. MCAD, 524 N.E.2d 84, 88-89 (Mass. 1988) (chapter 151B). The plaintiff's claims of a retaliatory hostile work environment are more stereotypical. These claims are based upon the pervasive retaliation that the plaintiff allegedly experienced after complaining about Ortiz's assault.

With this brief preface, we proceed to explicate the summary judgment standard and then examine the anatomy of the plaintiff's claims.

### A. The Summary Judgment Standard.

An order granting summary judgment engenders de novo review. Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997). In conducting that review, we must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences. Cox v. Hainey, 391 F.3d 25, 27 (1st Cir. 2004). For her part, the nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, "[e]vidence that is inadmissible at

trial, such as inadmissible hearsay, may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998); accord Garside, 895 F.2d at 49.

Most of the facts presented by the plaintiff, as recounted above, satisfy this standard. In large part, the chronicled events are within the plaintiff's personal knowledge. The insults and taunting that the plaintiff recounts do not create hearsay problems; those statements are not offered for their truth, but, rather, to show that the words were spoken (and, thus, contributed to the hostile work environment). They are, therefore, admissible. See Mota v. Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512, 526 n.46 (5th Cir. 2001). The statements made by supervisors are admissible as non-hearsay statements of the defendant's agents made within the scope of their employment. See Fed. R. Evid. 801(d)(2)(D).

We note, however, that two statements give us pause. The first is a statement from an unnamed coworker that other employees told him to "stay away" from the plaintiff as she was "trouble." Insofar as the plaintiff is attempting to introduce this statement as evidence of other coworkers' harassing behavior, it is hearsay; its probative value ultimately depends on the truth of the declarant's own unsworn out-of-court utterance. It is, therefore,

inadmissible.[2] See Fed. R. Evid. 801, 802; see also Vazquez, 134
F.3d at 34. A similar problem exists with respect to the
plaintiff's assertion that a tow truck driver said that Gilardi had
been circulating a petition to have the plaintiff fired.
Consequently, we cannot consider the content of either statement in
analyzing the plaintiff's claims. See LaRou v. Ridlon, 98 F.3d
659, 663 (1st Cir. 1996) (branding incompetent on summary judgment
portions of a party's affidavit recounting inadmissible hearsay).

### B. **Timeliness**.

The first question that we must answer pertains to
timeliness. In order to prosecute a harassment claim under either
Massachusetts or federal law, an aggrieved party must first file a
timely administrative complaint. The time parameters for these
filings differ. In 1999, chapter 151B mandated filing with the
MCAD within six months of the alleged violation. See Mass. Gen.
Laws ch. 151B, § 5 (1989) (amended 2002). By contrast, the EEOC
filing had to occur within 300 days of the date of the alleged
violation. See 42 U.S.C. § 2000e-5(e)(1); see also Sabree v.
United Bhd. of Carpenters & Joiners, 921 F.2d 396, 399 & n.5 (1st
Cir. 1990) (discussing timely filing of charges of discrimination

---

[2]Were that statement offered as evidence of the declarant's
contribution to the hostile work environment, it would likely be
admissible. In that event, its effect on the plaintiff would be
the same regardless of the truth of the matter asserted. See Mota,
261 F.3d at 526 n.46. Here, however, the plaintiff's affidavit
takes the air out of any suggestion that the declarant's statement
was itself a product of retaliatory animus.

with the EEOC in "deferral" states, i.e., states such as Massachusetts, which have their own civil rights statute and agency). There is no dispute that the plaintiff met these administrative deadlines; the earliest incident of alleged harassment occurred on September 11, 1999, and the plaintiff's administrative complaint was filed with both agencies on March 6, 2000.

A claimant who wishes to sue under chapter 151B must allow a waiting period to pass, file her suit, and notify the MCAD (which is then required to dismiss the administrative proceeding). Mass. Gen. Laws ch. 151B, § 9. This civil suit must be instituted no later than three years after the occurrence of the alleged violation. See id. The federal prototype is different. A Title VII claimant may sue only after the EEOC issues a right-to-sue letter. 42 U.S.C. § 2000e-5(f)(1). Once such a letter is received, the claimant must file her suit within ninety days. Id. The fact that an analogous state statute of limitations has expired with respect to a parallel state harassment action does not create a temporal bar to a Title VII suit. See Burgh v. Borough Council, 251 F.3d 465, 473 (3d Cir. 2001); Kirk v. Rockwell Int'l Corp., 578 F.2d 814, 819 (9th Cir. 1978); Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 522 (6th Cir. 1975).

Here, the plaintiff's Title VII claims are unquestionably timely: she received a right-to-sue letter on April 25, 2003 and

-12-

added her Title VII claims to her pending suit on May 19, 2003. The situation is more tenebrous with regard to the chapter 151B claims. The plaintiff first brought suit on these claims on November 1, 2002. Based on the three-year statute of limitations applicable to chapter 151B actions, this would seem to foreclose recovery for any incidents that occurred prior to November 1, 1999, including the original sexual harassment and several of the instances of alleged retaliation.

The plaintiff offers a theory as to why these claims nonetheless are timely. After reviewing her thesis, we conclude that her state-law claims based on the Ortiz imbroglio are barred but that her retaliation claims are not. We explain briefly.

Massachusetts law recognizes that "some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 936 (Mass. 2001). Under this continuing violation doctrine, a plaintiff who ordinarily would be unable to recover damages for discrete acts of discrimination falling outside the limitations period may avoid that bar if those acts are shown to be part of a pattern of discrimination anchored by acts that occurred within the limitations period. Id. at 936-37. Hostile environment claims, by their nature, often fall within this rubric. See id. at 937; Clifton v. Mass. Bay Transp. Auth.,

-13-

815 N.E.2d 614, 624 (Mass. App. Ct. 2004). In such situations, however, the anchoring event must "substantially relate[] to earlier incidents of abuse and substantially contribute[] to the continuation of a hostile work environment." Cuddyer, 750 N.E.2d at 938.

The application of the continuing violation doctrine sometimes has the effect of expanding the three-year filing deadline for suits under chapter 151B. See, e.g., Clifton, 815 N.E.2d at 620-21; Carter v. Comm'r of Corr., 681 N.E.2d 1255, 1261-62 (Mass. App. Ct. 1997). We thus confront the question of whether the facts in this case, taken in the light most favorable to the plaintiff, make out a continuing violation.

On the one hand, we think that reasonable jurors could find that the distasteful and unpleasant actions undertaken by the plaintiff's coworkers before and after November 1, 1999 were part of a pattern of retaliation. For one thing, the harassment began soon after the plaintiff lodged her initial complaint about Ortiz's boorishness and surfaced most frequently in the first few months after Ortiz was dismissed. When harassment follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988); Mole v. Univ. of Mass., 814 N.E.2d 329, 341 (Mass. 2004). For another thing, the harassment itself offered circumstantial evidence of causation; coworkers

referred to the plaintiff as a "rat" (a term that connotes an informer or snitch), lamented the firing of their "good supervisor," and took up a collection for his benefit. Even as late as 2001, Gilardi committed an act of harassment and, shortly thereafter, made reference to the plaintiff's upcoming "payday." Up to that point, we believe that reasonable jurors could deem the listed incidents to comprise a pattern of retaliatory harassment. Since this pattern includes events within and without the limitations period, we are free to use incidents from both periods in deciding whether the plaintiff has made out a prima facie case of a hostile work environment under chapter 151B.

That said, we find unpersuasive the plaintiff's labored effort to include Ortiz's solitary act of sexual harassment as part of the pattern of subsequent retaliatory acts. This attempted agglomeration relies heavily, but mistakenly, upon the MCAD's decision in Muise v. Credit Exch., 17 M.D.L.R. 1684 (MCAD 1995), a case in which the agency said that timely incidents of retaliation may anchor an untimely incident of sexual harassment if "the charge of retaliation is inextricably related to the original charge of sexual harassment." Id. at 1690. The plaintiff overlooks that in order to invoke this doctrine, a claimant must show at a bare minimum a series of discriminatory acts that emanate from the same discriminatory animus. See Provencher v. CVS Pharmacy, 145 F.3d 5,

14 (1st Cir. 1998); see also Morrisey v. Holiday Inn, 25 M.D.L.R. 74, 86 n.12 (MCAD 2003) (citing Provencher). We explain briefly.

When an individual sexually harasses a victim and then engages in non-sexual retaliatory harassment, the sexual and non-sexual harassment arguably may be part and parcel of the same violation. Cf. O'Rourke, 235 F.3d at 729 (noting that, in such circumstances, the non-sexual harassment is still charged with the original animus). But cf. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790-91 (6th Cir. 2000) (refusing to aggregate sexual harassment and non-sexual retaliatory harassment undertaken by a single supervisor). That was the fact pattern in Muise, 17 M.D.L.R. at 1686-87.

The majority of cases are not cut from this seamless cloth. Even when retaliation is derivative of a particular act of harassment, it normally does not stem from the same animus. Most often, retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice. See, e.g., Ruffino v. State St. Bank & Trust Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995); Tinkham v. Flatley Co., No. 98-BEM-0437, 2004 WL 1746070, at *12 (MCAD July 7, 2004) (quoting Ruffino). That is a different animus than the sexual animus that drove the original harassment.

This case aptly illustrates the disparity of motives. Ortiz's attack was a one-time incident of sexual harassment. By contrast, the retaliatory harassment consisted of a series of discrete acts orchestrated by a cohort of different individuals (not including Ortiz) and occurring over a period of many months (beginning only after Ortiz was suspended). Of critical importance, nothing in the record indicates that these retaliatory acts were undertaken for reasons related to the plaintiff's gender. As such, the sexual harassment and retaliatory harassment in this case must be viewed for what they are: two separate and independent harms. See Goguen v. Quality Plan Adm'rs, 11 Mass. L. Rptr. 288, 2000 WL 282485, at *4 (Mass. Super. Ct. 2000) (holding that sexual harassment by one person and subsequent retaliation by another are not sufficiently related to add up to a single continuing violation); cf. Sitar v. Ind. Dep't. of Transp., 344 F.3d 720, 726 (7th Cir. 2003) (noting generally that "retaliation . . . and sexual harassment charges are not 'like or reasonably related' to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another"). The plaintiff cannot rely on the second to revive the first.

For much the same reason, we decline the plaintiff's invitation to treat her case as one involving a "mixed-motive" claim. In support of this entreaty, the plaintiff relies upon Lam v. Univ. of Hawai'i, 40 F.3d 1551 (9th Cir. 1994), and Hicks v.

Gates Rubber Co., 833 F.2d 1406 (10th Cir. 1987). Both decisions held, however, that race and sex may be aggregated under Title VII where the allegations involved discrimination against a subclass of people sharing both protected traits but not against those sharing only one or the other. See Lam, 40 F.3d at 1561-62 (involving discrimination against a subclass of Asian women); Hicks, 833 F.2d at 1416 & n.2 (involving discrimination against a subclass of black women). Such a claim still involves a single wrong and a single harm, prompted by a single animus. That is clearly not the case here: Ortiz's assault was not directed at the plaintiff due to her status as a complaining woman, as she was not yet a member of that subclass when the assault occurred. Lam and Hicks are, therefore, inapposite.

To sum up, we find timely the plaintiff's Title VII sexual harassment claim and her federal and state claims for retaliatory harassment. We find untimely, however, her state-law sexual harassment claim (and, therefore, affirm the district court's entry of summary judgment for the defendant on that claim).

C.  **Retaliatory Hostile Work Environment:  Cognizability**.

We turn now to the cognizability of the retaliatory harassment claims.  Both Title VII and chapter 151B contain provisions that make it unlawful for employers to retaliate against persons who complain about unlawfully discriminatory employment practices.  See 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B,

-18-

§ 4(4). To engage the gears of either statute, a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked. See Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003) (Title VII); Sullivan v. Raytheon Co., 262 F.3d 41, 48 (1st Cir. 2001) (chapter 151B).

Here, there is no dispute that the plaintiff engaged in protected activity by filing a complaint. The parties instead spar over the second and third elements, which in this instance collapse into a single question: did the plaintiff sustain an adverse employment action in the form of a hostile work environment based on retaliation for filing a sexual harassment complaint against Ortiz?

Typically, an adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay). This case is more nuanced. In order for the plaintiff to survive summary judgment on this record, she must show that, as a legal matter, the creation and perpetuation of a hostile work environment itself can constitute a retaliatory adverse employment action. She also must show that, as a factual matter, her coworkers' actions furnished a sufficient basis to ground a finding that a hostile work environment actually existed.

As to the legal point, the plaintiff maintains that a hostile work environment may constitute an adverse employment action for purposes of both Title VII and chapter 151B. The city demurs. It notes that the plaintiff has not been cashiered, demoted, denied promotion, stripped of meaningful duties, or otherwise materially disadvantaged in the terms and conditions of her employment. Thus, the city argues, she cannot be said to have suffered an adverse employment action.

This precise question — whether a hostile work environment can constitute a retaliatory adverse employment action — has never been fully addressed either by this court (with regard to Title VII) or by the Massachusetts Supreme Judicial Court (with regard to chapter 151B). We look at the federal and state claims separately.

1. **Title VII**. The weight of authority supports the view that, under Title VII, the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action under 42 U.S.C. § 2000e-3(a). See, e.g., Von Gunten v. Maryland, 243 F.3d 858, 864-65 (4th Cir. 2001); Ray v. Henderson, 217 F.3d 1234, 1244-45 (9th Cir. 2000); Morris, 201 F.3d at 791; Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998); Knox v. Indiana, 93 F.3d 1327, 1334-35

(7th Cir. 1996). That view has engendered a circuit split. The Fifth Circuit has held that a hostile work environment cannot constitute a retaliatory adverse employment action; instead, retaliation requires an "ultimate employment decision . . . such as hiring, granting leave, discharging, promoting, and compensating." Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997); see also id. at 709. The Eighth Circuit also requires an "ultimate employment decision," Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997), but defines that term somewhat more elastically, see, e.g., Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 968-69 (8th Cir. 1999).

Although this court has never fully analyzed the question, our case law tilts noticeably toward the majority view. The pertinent decisions form a totem pole. At the base of the pole is Wyatt v. City of Boston, 35 F.3d 13 (1st Cir. 1994) (per curiam), where, in dictum, we cited a treatise for the proposition that "toleration of harassment by other employees" might amount to an adverse employment action. Id. at 15-16 (citing 3 Arthur Larson & Lex K. Larson, Employment Discrimination § 87.20 (1994)). That led to a series of epibolies: in Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998), we paraphrased the Wyatt dictum; in White v. New Hampshire Department of Corrections, 221 F.3d 254, 262 (1st Cir. 2000), we noted the Hernandez-Torres paraphrase with approbation; in Marrero v. Goya of

-21-

Puerto Rico, Inc., 304 F.3d 7, 26 (1st Cir. 2002), we approvingly cited White's reference; and in Che v. Massachusetts Bay Transportation Authority, 342 F.3d 31, 40 (1st Cir. 2003), we made a bow in the direction of Marrero. This totem pole is highly suggestive. Today, we cap it off and hold explicitly that a hostile work environment, tolerated by the employer, is cognizable as a retalitory adverse employment action for purposes of 42 U.S.C. § 2000e-3(a). This means that workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases.

This conclusion is compelled by the statutory text and comports with congressional intent. The operative provision of Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Given Congress's intention "to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment," Harris, 510 U.S. at 21 (citation and internal quotation marks omitted), it makes sense to construe the qualifier (regarding "compensation, terms, conditions, or privileges of employment") broadly. On that basis, the verb "discriminate," as used in section 2000e-2(a)(1),

-22-

logically includes subjecting a person to a hostile work environment. See Morris, 201 F.3d at 791-92.

We move next to Title VII's anti-retaliation provision. That provision directs an employer not to discriminate against any employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Here, the term "discriminate" appears without the qualifier. A familiar canon of construction teaches that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears." Ratzlaf v. United States, 510 U.S. 135, 143 (1994). We apply that canon here. The result: the verb "discriminate" in the anti-retaliation clause includes subjecting a person to a hostile work environment. See Morris, 201 F.3d at 792; see also Knox, 93 F.3d at 1334 ("Nothing indicates why . . . retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII . . . does not fall within the statute.").

Our interpretation of the statutory text is shared by the EEOC, which finds the lack of any qualifier on the term "discriminate" in the anti-retaliation context to evince a purpose to "prohibit any discrimination that is reasonably likely to deter protected activity." EEOC Compl. Man. (CCH) ¶ 8005, § 8-II.D.3 (2004). This is important because an administrative interpretation

of a federal statute by the agency charged with its enforcement, while not controlling upon the courts, constitutes an informed judgment to which some deference ordinarily is due.[3]  See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986).

If more were needed — and we doubt that it is — this capacious reading of section 2000e-3(a) is consonant with its purpose of "[m]aintaining unfettered access to statutory remedial mechanisms."  Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). Harassment by coworkers as a punishment for undertaking protected activity is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity. Ray, 217 F.3d at 1245; Wideman, 141 F.3d at 1456.  Reading the statute to provide a remedy for retaliatory harassment that expresses itself in the form of a hostile work environment thus furthers the goal of ensuring access to the statute's remedial mechanisms.

---

[3]We emphasize that we refer here only to Skidmore deference, not Chevron deference.  Compare Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), with Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984).  After all, statements in the EEOC's Compliance Manual are neither adjudicatory nor the product of notice-and-comment rulemaking.  See United States v. City of New York, 359 F.3d 83, 93 (2d Cir. 2004); cf. Navarro v. Pfizer Corp., 261 F.3d 90, 99 (1st Cir. 2001).  They are, therefore, entitled to deference only to the extent that they have the power to persuade.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000).

**2. Chapter 151B**. As for the state-law claim, we believe that, were the Massachusetts Supreme Judicial Court (SJC) squarely presented with the question, it would find a retaliatory hostile work environment to be an adverse employment action cognizable under chapter 151B, § 4(4). Several factors enter into this determination.

First and foremost, the statute's anti-discrimination and anti-retaliation provisions are very similar to the counterpart provisions contained in Title VII. Where such linguistic similarity exists, the SJC frequently looks to federal court interpretations of Title VII for guidance. See Wheatley v. AT&T Co., 636 N.E.2d 265, 268 (Mass. 1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting [chapter] 151B."); College-Town, Div. of Interco, Inc. v. MCAD, 508 N.E.2d 587, 591 (Mass. 1987) (describing federal precedents as "helpful"). We are, therefore, confident that the SJC, if confronted with this precise question, would quite likely interpret the anti-retaliation provision of chapter 151B exactly as we have interpreted the counterpart provision of Title VII.

Second, to the extent that any ambiguity lurks in the statutory language, Massachusetts law explicitly directs that the provisions of chapter 151B "shall be construed liberally for the accomplishment of its purposes." Mass. Gen. Laws ch. 151B, § 9.

As with Title VII, the purpose of the anti-retaliation provision in chapter 151B is to allow parties to "seek redress for allegations of discrimination without fear of retaliation for or interference with the exercise of that right."  Sahli v. Bull HN Info. Sys., Inc., 774 N.E.2d 1085, 1090 (Mass. 2002).  Construing chapter 151B's text to protect complaining employees from retaliatory harassment that results in the creation and perpetuation of a hostile work environment advances that purpose.

Third, although the SJC has not spoken directly to the subject, the Appeals Court has recognized a claim of retaliatory harassment based on a hostile work environment.  See Clifton, 815 N.E.2d at 618, 624.  While this holding is not indisputably authoritative — the highest court of a state is, after all, the final arbiter of state-law questions, Acadia Ins. Co. v. McNeil, 116 F.3d 599, 604 (1st Cir. 1997) — the decision of an intermediate appellate court of the state generally constitutes a reliable piece of evidence.  See West v. ATCT Co., 311 U.S. 223, 237 (1940); Fortini v. Murphy, 257 F.3d 39, 49 (1st Cir. 2001); Losacco v. F.D. Rich Constr. Co., 992 F.2d 382, 384 (1st Cir. 1993).  This evidence seems all the more compelling in this case because the MCAD — whose decisions construing chapter 151B are ceded some deference by the SJC, Cuddyer, 750 N.E.2d at 938 — has interpreted chapter 151B's anti-retaliation language to include retaliatory harassment culminating in a hostile work environment.  See MCAD Sexual

-26-

Harassment in the Workplace Guidelines IX.B (2002) ("An employer takes adverse action under § 4(4) when it materially disadvantages the complainant with regard to any of the terms or conditions of her employment.  The term 'adverse action' can encompass . . . hostile or abusive workplace treatment."); Wareing v. New Bedford Sch. Dep't, No. 99-BEM-3363, 2004 WL 2361016, at *8 (MCAD Oct. 6, 2004) ("Retaliation may . . . take the form of hostile or abusive workplace treatment.).

To say more on this topic would be to paint the lily. For the reasons elucidated above, we hold that, under Massachusetts law as under Title VII, subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action (and, thus, triggers the statutory prophylaxis).

**D.  Retaliatory Hostile Work Environment:  Sufficiency of Proof.**

We have established that, as a theoretical matter, subjecting a party to a hostile work environment in retaliation for protected activity may be actionable under both Title VII and chapter 151B.  That poses the question whether the evidence in this case, viewed in the light most favorable to the plaintiff, Garside, 895 F.2d at 48, shows that a hostile work environment existed.  We turn to that question.

**1.  Elements of the Cause of Action.**  An allegedly retaliatory act must rise to some level of substantiality before it

can be actionable. Wideman, 141 F.3d at 1456; MacCormack v. Boston Edison Co., 672 N.E.2d 1, 7-8 (Mass. 1996). The hostile work environment doctrine, as developed in the anti-discrimination jurisprudence of Title VII, embodies that prerequisite.

In order to prove a hostile work environment, a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment. Faragher, 524 U.S. at 786. The harassment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 787. In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 787-88 (quoting Harris, 510 U.S. at 23). The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment. Id. at 788.

This framework is readily transferable to the retaliatory harassment context. On the one hand, if protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not

be deterred from such activity. After all, an employee reasonably can expect to encounter such tribulations even if she eschews any involvement in protected activity. On the other hand, severe or pervasive harassment in retaliation for engaging in protected activity threatens to deter due enforcement of the rights conferred by statutes such as Title VII and chapter 151B.

Along this continuum, rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim. See Manatt v. Bank of Am., 339 F.3d 792, 803 (9th Cir. 2003); Gagnon v. Sprint Corp., 284 F.3d 839, 850 (8th Cir. 2002); cf. Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 52 n.12 (1st Cir. 1999) (noting, in related context, that "social ostracism alone is rarely actionable"). The anti-discrimination laws were not enacted to create or enforce a "general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). So too the anti-retaliation laws.

2. **Applying the Requirements**. Having sketched the contours of retaliatory hostile work environments in the Title VII and chapter 151B milieus, we reach the central question presented in this appeal: viewing the totality of the circumstances in the light most flattering to the plaintiff, is the evidence of retaliatory harassment adequate to allow a reasonable jury to find that she was confronted by a hostile work environment?

At the outset, we take note of a unique difficulty posed by allegations of retaliatory harassment. When dealing with discriminatory harassment (e.g., harassment based on gender, race, or the like), there is seldom, if ever, a defensible purpose behind the injurious actions. The only question is whether the bad acts, taken in the aggregate, are sufficiently severe or pervasive to constitute actionable harassment. See, e.g., Cardenas v. Massey, 269 F.3d 251, 261-62 (3d Cir. 2001); Johnson v. City of Fort Wayne, 91 F.3d 922, 932 (7th Cir. 1996).

Retaliatory harassment, however, requires a more nuanced analysis. The very act of filing a charge against a coworker will invariably cause tension and result in a less agreeable workplace. Von Gunten, 243 F.3d at 870. The target of the complaint likely will have coworker-friends who come to his defense, while other coworkers will seek to steer clear of trouble by avoiding both the complainant and the target. Although admittedly a source of unpleasantness in the workplace, such behavior should not be seen as contributing to a retaliatory hostile work environment. Id. After all, there is nothing inherently wrong either with supporting a friend or with striving to avoid controversy. We think it follows that those actions that are hurtful to a complainant only because coworkers do not take her side in a work-related dispute may not be considered as contributing to a retaliatory hostile work environment. It is only those actions, directed at a complainant,

that stem from a retaliatory animus which may be factored into the hostile work environment calculus.

Even with these nuances in mind, we conclude that the evidence in this case, viewed in the light most favorable to the plaintiff, would permit — although certainly not compel — a reasonable jury to find that the plaintiff was subjected to a retaliation-based hostile work environment. In reaching this conclusion, we take into account the relative ubiquity of the retaliatory conduct, its severity, its natural tendency to humiliate (and, on occasion, physically threaten) a reasonable person, and its capacity to interfere with the plaintiff's work performance. See Harris, 510 U.S. at 23.

In the months immediately following the plaintiff's initial series of complaints about Ortiz's actions, she was subjected to a steady stream of abuse. Much of this was significant and was of a kind that courts historically have found persuasive as evidence of a hostile work environment. She was falsely accused of misconduct (DiGirolamo levied a baseless charge against her in the tampon-throwing incident) — and the case law recognizes that false accusations of misconduct can contribute to the creation of a hostile work environment. See Ray, 217 F.3d at 1245; Aviles v. Cornell Forge Co., 183 F.3d 598, 606 (7th Cir. 1999). DiGirolamo also interfered with the plaintiff's working conditions by falsely informing her that she was required to take

her dinner breaks alone — and "work sabotage, exclusion, [and] denial of support" also may contribute to the creation of a hostile work environment.  O'Rourke, 235 F.3d at 730.  The harassing insults directed at the plaintiff are likewise entitled to some weight in the decisional calculus.  See Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994) (noting that even infrequent harassing insults should be considered, along with other instances of harassment).  So too the taunting of the plaintiff with the collection on behalf of Ortiz.[4]  Marrero, 304 F.3d at 26 (finding that taunting plaintiff in relation to her filing of an EEOC complaint was evidence of retaliatory harassment); cf. Oncale, 523 U.S. at 80 (noting that open and direct hostility clearly based on protected status is evidence of hostile work environment).

Gilardi's continued tormenting of the plaintiff is also relevant.  Soon after the collection incident, Gilardi interfered with the plaintiff's ability to work by leaving her out in the cold (literally, not figuratively).  This conduct may be seen as having contributed to the creation of a hostile work environment.  See

---

[4]To be sure, the mere fact that coworkers collect money on behalf of a person accused of discrimination is not actionable. Such behavior falls outside the realm of conduct undertaken out of animus toward a complainant and should not be considered for purposes of determining whether there was a hostile work environment.  The fact that coworkers rubbed the plaintiff's nose in the collection is a horse of a different hue.  If the incident occurred as the plaintiff suggests (an assumption that we must indulge at the summary judgment stage), it was a clear indication of open hostility directed at the plaintiff and would have deleteriously affected her working conditions.

Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 472 (1st Cir. 2002); O'Rourke, 235 F.3d at 730. Gilardi later placed the plaintiff at risk of physical harm by coming close to striking her with a van; if that was intentional (and, for now, we must credit the plaintiff's averment that it was), it is a cogent indicator of an adverse change in the conditions of the plaintiff's employment. Cf. White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 n.6 (4th Cir. 2004) (noting that "the presence of physical threats undeniably strengthens a hostile work environment claim"); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (similar). To cinch matters, the plaintiff offered evidence that these incidents contributed to physical and psychological problems that required treatment, thus underscoring the negative effect on her work performance.

Of course, no pat formula exists for determining with certainty whether the sum of harassing workplace incidents rises to the level of an actionable hostile work environment. See Harris, 510 U.S. at 22. Such a determination requires the trier of fact to assess the matter on a case-by-case basis, weighing the totality of the circumstances. Lipsett v. Univ. of P.R., 864 F.2d 881, 898 & n.18 (1st Cir. 1988). Our function is one of screening, that is, to determine whether, on particular facts, a reasonable jury could reach such a conclusion. Rivera-Rodríguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 24 (1st Cir. 2001). Taking the aggregate facts of record in the light most favorable to the plaintiff, we

believe that a jury rationally could find that the plaintiff was subjected to a hostile work environment arising out of retaliation for her complaint against a popular coworker.

### E. The Liability Standard.

This conclusion takes us to the liability standard. In importing the hostile work environment doctrine into the anti-retaliation context, courts are left to draw the standards for employer liability from the case law involving hostile work environments in the anti-discrimination context. The Supreme Court has divided the universe of employer liability along a line that separates supervisors from non-supervisors. When a supervisor creates a hostile work environment, the employer is vicariously liable for it, subject, however, to a possible affirmative defense. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher, 524 U.S. at 807-08.

This defense, familiarly known as the Faragher/Ellerth defense, consists of two elements which, if proven, permit the employer to avoid liability. First, the employer must show that it "exercised reasonable care to prevent and correct promptly" the harassment. Ellerth, 524 U.S. at 765. Second, the employer must show that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

-34-

As with Title VII, chapter 151B makes employers vicariously liable for hostile work environments created by supervisors. College-Town, 508 N.E.2d at 592. Unlike Title VII, however, chapter 151B does not afford employers any affirmative defenses to liability. Based on the legislative mandate that chapter 151B must be construed liberally to effectuate its purposes, see Mass. Gen. Laws ch. 151B, § 9, the SJC has endorsed a rule that holds employers strictly liable for supervisory harassment. See College-Town, 508 N.E.2d at 591-94 (rejecting a "reasonable care" standard as a defense to a hostile work environment claim); see also Blockel v. J.C. Penney Co., 337 F.3d 17, 28 n.3 (1st Cir. 2003) (noting that the Faragher/Ellerth defense does not apply to chapter 151B actions). Because the reasoning of College-Town belies any meaningful distinction between discriminatory harassment and retaliatory harassment where supervisors are concerned, we conclude that no Faragher/Ellerth type of affirmative defense is available under chapter 151B to an employer whose supervisors create a retaliatory hostile work environment.

When coworkers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment, Title VII and chapter 151B seem essentially coterminous as they relate to employer liability. Notwithstanding the absence of a controlling Supreme Court precedent, several federal courts,

-35-

including this court, have held that, in such situations, an employer can only be liable if the harassment is causally connected to some negligence on the employer's part. See, e.g., Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 976 (7th Cir. 2004); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333-34 (4th Cir. 2003); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002). Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it. See Crowley, 303 F.3d at 401. Similarly, under chapter 151B, employer liability for coworker harassment requires a showing that the employer knew or should have known about the harassment, yet failed to halt it. Messina v. Araserve, Inc., 906 F. Supp. 34, 37-38 (D. Mass. 1995) (discussing Massachusetts law); College-Town, 508 N.E.2d at 593.

At the summary judgment stage, these determinations are complicated. The question of whether an employee is a supervisor in the relevant sense is itself factual in nature. Hrobowski v. Worthington Steel Co., 358 F.3d 473, 478 (7th Cir. 2004). Here, the lower court found only coworker harassment; it declared that the evidence showed that the retaliation had been undertaken by "subordinate officials, none of whom had control over terms and conditions of [the plaintiff's] employment."

The district court's skepticism about the claimed supervisory status of some of the harassers seems well-founded.

The key to determining supervisory status is the degree of authority possessed by the putative supervisor. Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004); Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1033 (7th Cir. 1998). Thus, courts must distinguish "employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." Parkins, 163 F.3d at 1033; accord Mikels v. City of Durham, 183 F.3d 323, 334 (4th Cir. 1999). Having in mind both common law agency principles and the purposes of the anti-discrimination and anti-retaliation laws, we agree with the Seventh Circuit that "the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment." Parkins, 163 F.3d at 1034. This authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." Id. at 1034. Without some modicum of this authority, a harasser cannot qualify as a supervisor for purposes of imputing vicarious liability to the employer in a Title VII case, but, rather, should be regarded as an ordinary coworker.[5] See id. at 1033-34. We think that the same standard applies under chapter 151B. See College-Town, 508 N.E.2d at 593 (observing that

---

[5]The Second Circuit takes a somewhat broader view. That court considers a supervisor to be someone who has actual authority to direct an employee's work-related tasks in a way that could increase her workload or saddle her with less desirable tasks. Mack v. Otis Elev. Co., 326 F.3d 116, 126-27 (2d Cir. 2003). Even were we to adopt this less demanding test, the nominal supervisors here would not qualify as supervisors in fact.

the power wielded by a harassing supervisor may range from "discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment").

In this case, the plaintiff has not presented facts sufficient to show that she was harassed at the hands of persons who qualify as supervisors. The deposition of Irene Landry provides the clearest evidence of the organizational structure of the workplace. The parking enforcement officers are on the lowest rung of the ladder. On the next rung are the shift supervisors, who drive the parking enforcement officers to their assigned routes and pick them up. The third rung is occupied by more senior supervisors, (each of whom holds the title "senior supervisor II"). The functions of these individuals include dealing with personnel problems. During the time in question, Landry held the position of senior supervisor II. She reported to Moccia, a higher-level official who held the title of senior supervisor of parking enforcement. Moccia had authority to handle a wide variety of employee issues and complaints.

The plaintiff uses the word "supervisor" indiscriminately, referring to people on the second, third, and fourth rungs as "supervisors" and making no distinctions among them. That approach elevates nomenclature over actual authority. When we shift the focus to those persons whose actual authority

made them supervisors in the relevant sense, a different picture emerges.

Landry and Moccia each appear to have possessed the requisite authority, but neither of them were guilty of any retaliatory harassment. The only two "supervisors" whose actions rationally can be said to have contributed to the hostile work environment are Gilardi and DiGirolamo. Gilardi was a second-rung shift supervisor, and DiGirolamo's level of authority seems no greater (the record only permits us to speculate on this point, and the lack of proof counts against the plaintiff). The plaintiff has presented us with no evidence that either woman had the power to terminate, discipline, or otherwise affect the terms and conditions of her employment. In the absence of such evidence, the city cannot be held vicariously responsible for their harassment.

The plaintiff's claim thus reduces to one of coworker harassment. The viability of that claim depends on whether there is sufficient evidence to permit a finding that the employer knew or should have known about the hostile work environment, yet failed to stop it. We conclude that sufficient evidence exists. Plaintiff complained of the harassment to two senior supervisors (Landry and Moccia). Landry did not deal with the plaintiff's complaints at all and Moccia, rather than rectifying the situation, speculated that the harassment would likely become "ten times worse" with the plaintiff's recent shift change. Moreover, the

deputy commissioner was aware of the harassment, but did nothing to dispel it. Since Landry, Moccia, and the deputy commissioner were appropriate recipients of the plaintiff's complaints, there is enough evidence to allow a finding of actual notice on the city's part. See Crowley, 303 F.3d at 403; Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000).

The city's only rejoinder is that the supervisors responded to the plaintiff's allegations in an appropriate manner. At best, this presents a factual dispute that is not amenable to resolution on summary judgment. Consequently, there is a trialworthy issue as to whether the city was negligent in not putting a stop to the harassment.

### F. **Sexual Harassment Under Title VII**.

This brings us to the plaintiff's claim that Ortiz's assault subjected her to a hostile work environment based on her sex.[6] Even if the assault was sufficient, in and of itself, to create a hostile work environment — a proposition that we regard as highly dubious — the plaintiff cannot prevail. Though she refers to Ortiz as her "supervisor," the record contains a paucity of evidence about his job description and authority. That which does appear indicates that Ortiz, like Gilardi, was merely a second-rung shift supervisor. As the plaintiff provided no evidence that such

---

[6]This claim is, of course, limited to Title VII. Insofar as it might have been brought under chapter 151B, it is time-barred. See supra Part II(B).

an employee had the authority to hire, fire, or otherwise dictate the terms and conditions of employment, vicarious liability is off the table. It follows that the plaintiff can survive summary judgment only if she can show that a rational jury could find the city negligent because it knew or should have known of the harassment yet failed to take prompt action to stop it. Crowley, 303 F.3d at 401.

The plaintiff cannot carry this burden. There is no evidence of any prior misconduct on Ortiz's part. The first that the city knew (or could have known) about his assaultive demeanor was when it received the initial report of the attack. The undisputed evidence shows that a mere seven days elapsed between the time of the assault and the commencement of disciplinary proceedings (which began with Ortiz's immediate suspension and culminated in his discharge). Between the assault and the suspension, the plaintiff says that she "encountered" Ortiz in the workplace, but there is no evidence that she was forced to work with him or was exposed to further harassment by him. While we leave open the possibility that, under certain extreme circumstances, a delay of seven days in separating a harasser and his victim might evince negligence, there is nothing to indicate that the city acted here in a dilatory manner. On this record, a rational jury could only conclude that, as to the Title VII sexual harassment claim, the city acted in a professional and appropriate

manner to resolve the problem.  No more was exigible.  <u>See</u>, <u>e.g.</u>, <u>Reed</u> v. <u>MBNA Mktg. Sys., Inc.</u>, 333 F.3d 27, 34-35 (1st Cir. 2003) (noting that investigation of sexual assault by employer, quickly leading to malefactor's termination, indicates reasonable care on behalf of employer).

That ends this aspect of the matter.  One of the main purposes of Title VII is to encourage proactive resolution of workplace harassment.  We would undermine that purpose were we to subject the city to sexual harassment liability despite its prompt and effective action in investigating the incident and removing the perpetrator from the workplace.

## III.  CONCLUSION

We need go no further.  To recapitulate, we hold that the plaintiff has presented sufficient evidence to survive summary judgment on her retaliatory harassment claims under Title VII and chapter 151B.  As to her sexual harassment claims, however, we reach a different conclusion.  Her chapter 151B claim is time-barred and her Title VII claim is foreclosed by her failure to present a trialworthy issue about whether the city was negligent in its handling of the Ortiz situation.

**<u>Affirmed in part, vacated in part, and remanded</u>.  <u>No costs</u>.**

-42-