**Evelyn GORE, Plaintiff**

v.

**TRUSTEES OF DEERFIELD ACADEMY d/b/a Deerfield Academy, Defendant**

**No. Civ.A. 03–30135–KPN.**

United States District Court, D. Massachusetts.

July 27, 2005.

---

66

Kevin M. Kinne, Cain, Hibbard, Myers & Cook, P.C., Pittsfield, MA, Courtney S. Lane, Cain, Hibbard, Myers & Cook, P.C., Barrington, MA, for Plaintiff.

John C. Gates, Curtiss, Carey & Gates, George L. Goodridge, III, Curtiss, Carey, Gates & Graves, Greenfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 31)*

NEIMAN, United States Magistrate Judge.

The Trustees of Deerfield Academy d/b/a Deerfield Academy ("Defendant") have moved for partial summary judgment with respect to certain aspects of Evelyn Gore ("Plaintiff")'s employment discrimination claims. Defendant argues that Plaintiff is not entitled to either a lost tuition waiver benefit or emotional distress resulting from Defendant's alleged retaliation against Plaintiff's daughter, Sara Mar-

tin ("Martin"). The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c). For the following reasons, Defendant's motion for partial summary judgment will be allowed in part and denied in part.

## I. BACKGROUND

For summary judgment purposes, the following facts are undisputed and stated in a light most favorable to Plaintiff, the non-moving party. *See Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir.2005). Defendant is an independent secondary school located in Deerfield, Massachusetts, with an enrollment of approximately 600 students. Defendant also employs about 110 faculty and 210 staff members.

In December of 1999, Plaintiff was unemployed and pursuing job prospects through the state Department of Transitional Assistance ("DTA"). Plaintiff's DTA case worker, Quint Dawson ("Dawson"), and her job coordinator, Mary White ("White"), both knew that Plaintiff's daughter, Martin, was interested in attending Deerfield Academy. They connected Plaintiff with Florrie Paige ("Paige"), Defendant's Director of Food Services, and Michael McCarthy ("McCarthy"), Defendant's Production Manager. Plaintiff thereafter completed an employment application in which she indicated that she would be available for full-time, part-time and/or over-time work.

On January 5, 2000, following an interview with McCarthy, Defendant hired Plaintiff to work in the dining hall as a server. Plaintiff's job was for twenty hours per week, thirty-two weeks per year, at $7.50 per hour. Although Plaintiff was to work only during the academic year (thus the thirty-two weeks), she was told by Paige that she could work throughout the summer "if [she was] good." On January 15, 2000, Plaintiff's daughter, Martin, applied for admission to the school the following fall.

Plaintiff's employment was short-lived. On February 19, 2000—*i.e.*, after about six and one-half weeks on the job—Plaintiff was laid off, ostensibly because another employee was returning from medical leave. Plaintiff notes, however, that her "layoff" occurred a mere three days after she had complained to McCarthy that several co-workers had sexually harassed her and made inappropriate comments regarding her Attention Deficit Disorder ("ADD").

On March 10, 2000, Defendant notified Plaintiff's daughter, Martin, that she would not be offered admission, but placed on the school's wait list. In July, Defendant notified Martin that it would not have an opening for her and, therefore, could not offer her admission.

On August 7, 2000, Plaintiff filed a complaint against Defendant with the Massachusetts Commission Against Discrimination charging unlawful gender and disability discrimination, retaliation and sexual harassment. Subsequently, Plaintiff was issued a right to sue letter and she initiated this lawsuit. Plaintiff's complaint makes four claims: Count I alleges sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); Count II alleges discrimination in violation of the Americans with Disabilities Act ("ADA"); Count III alleges retaliation in violation of Title VII; and Count IV alleges retaliation in violation of the ADA. In due course, Defendant filed the instant motion for partial summary judgment.

## II. STANDARD OF REVIEW

"Summary judgment is warranted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Uncle Henry's,* 399 F.3d at 41 (quoting Fed. R. Civ. Pro. 56(c)). "An issue is 'genuine' for purposes of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Carcieri v. Norton,* 398 F.3d 22, 29 (1st Cir.2005) (citations and further internal quotation marks omitted). As pertinent here, summary judgment may be sought and entered on any part of a case. *See* Fed.R.Civ.P. 56(b).

### III. DISCUSSION

Defendant seeks partial summary judgment with respect to two aspects of Plaintiff's claims, both which relate to Plaintiff's damages: (1) a lost tuition waiver benefit; and (2) emotional distress resulting from Defendant's alleged retaliation when it denied admission to Plaintiff's daughter. The court will address each in turn.

### A. *Tuition Waiver*

■ Plaintiff alleges in her complaint that she "was denied a tuition waiver for her daughter, which is a benefit to which she otherwise would have been entitled in the absence of [Defendant]'s unlawful conduct." (Complaint ¶ 17.) "As a result," Plaintiff continues, she "suffered substantial damages by having to pay her daughter's tuition at another school." (*Id.*) For its part, Defendant argues that Plaintiff was never entitled to the tuition waiver benefit and, therefore, cannot claim its denial as damages. The court finds Defendant's position persuasive.

Prominently standing in Plaintiff's way is Defendant's Employee Handbook (Defendant's Exhibit 7, hereinafter the "handbook"). The handbook defines a "full-time employee" as one who "works a normal work week of 37–1/2 or 40 hours or works at least 1000 hours per year." (*Id.* at I–1.) Arguably, Plaintiff was a "full-time employee" since she might have worked at least 1,000 hours in the year 2000. However, the handbook goes on to classify full-time employees into two groups:

A Group I employee works a normal week 52 weeks per year.

A Group II employee works at least 1000 hours per year but less than 52 full-time weeks.

(*Id.*) Since Plaintiff was hired to work not fifty-two, but only thirty-two, weeks per year she was not a Group I employee. This is important because, according to yet another handbook provision, only "full-time Group I and contractual employees are eligible" for a tuition waiver for their qualifying children. (*Id.* at 11–19.) [1]

To be sure, Plaintiff makes several attempts to evade the handbook's clear language but, in the court's view, each effort falls short. First, Plaintiff argues that "several" of the six and one-half weeks she worked were comprised of "full time" hours. Thus, Plaintiff notes, her time sheets show the following weekly totals: 26¾ hours (week ending 1–16–00), 30 hours (week ending 1–23–00), 34 hours (week ending 1–30–00), 17¾ hours (week ending 2–6–00), 34¾ hours (week ending 2–13–00), and 27¼ hours (week ending 2–20–00). (Plaintiff's Exhibit E.) As is obvious, however, these weekly totals do not show full-time employment. More importantly, even if Plaintiff were arguably a "full-time" employee, she was not a Group I full-time employee. Again, to be classified as such, Plaintiff would have had to work fifty-two weeks in the year and a minimum of 37½ hours per week. There is simply nothing in the time sheets to indicate that

---

1. There is no dispute that Plaintiff was not a "contractual" employee.

Plaintiff would have met those requirements.

Second, Plaintiff suggests that the copy of the handbook attached to Defendant's motion may have not been in effect during the time of her employment since it describes policy and plan changes which apparently became effective in October of 2001. (See Defendant's Exhibit 7.) The pages Plaintiff cites, however, are clearly preliminary to the handbook itself and make no mention of changes to either of the provisions currently at issue. Moreover, the tuition waiver benefit and the employee classifications pages, the provisions at issue, bear an applicable date of "8/92," well prior to Plaintiff's employment in January of 2000.

Third, Plaintiff argues that Defendant's written policies, including presumably the handbook, were inconsistently enforced. However, she points to nothing in this regard involving the tuition waiver benefit or employee classification provisions. At best, Plaintiff broadly claims that there were "sick leave," "sexual harassment" and "discipline" policy inconsistencies, but, as Plaintiff must acknowledge, those policies have no bearing on the present motion for summary judgment.

Fourth, the handbook notwithstanding, Plaintiff asserts that she was "enticed" into believing that her daughter would be entitled to a tuition waiver. Unfortunately for her cause, however, the facts do not support that assertion either. At best, Dawson and White—the DTA officials—knew that Plaintiff was interested in having her daughter attend Deerfield Academy, but they made no promise that Martin would be entitled to a tuition benefit and, indeed, would have had no authority to do so. Similarly, neither Paige nor McCarthy, who arguably could speak on Defendant's behalf, made any promise that Martin would be eligible for a tuition waiver.[2] Moreover, Paige's suggestion that Plaintiff might be able to work through the summer was not only speculative (Plaintiff never made it to the summer) but conditional as well (summer work would have occurred only if Plaintiff were "good"). Finally, Plaintiff herself testified that McCarthy never discussed the possibility of a tuition

---

2. The relevant portion of Paige's deposition transcript reads as follows:

Q. When you spoke with [Plaintiff] about increasing her hours, did she ever mention that she was interested in her daughter attending Deerfield?

A. I knew that her daughter was interested in attending Deerfield but I don't know if it was [Plaintiff] who had told me herself directly.

Q. Mm-hmm. So who told you?

A. I don't remember how I knew but I knew that she thought Deerfield would be a good match for her daughter.

Q. And you knew that the only way her daughter could go there with the tuition waiver was for her to become a group one employee?

A. The tuition waiver only would have applied to a group one employee, but that would not have precluded her daughter from going to Deerfield.

Q. Right.

A. She would have been eligible for financial aid and we had another group two employee who was in a position to actually pay for his child to go to Deerfield.

(Defendant's Exhibit 14 at 97–98.) The relevant portion of McCarthy's deposition transcript reads as follows:

Q. . . . . [D]id [Plaintiff] ever discuss with you her desire for her daughter to attend Deerfield?

A. Directly to me? Not that I can recall.

Q. Were you aware that she desired to have her daughter attend Deerfield?

A. Yes.

Q. How many kitchen employees would you say have children who have attended Deerfield through the tuition waiver program while you've been there?

A. None.

Q. None?

A. None.

(Defendant's Exhibit F at 125–26.)

**70**

waiver benefit. (See Defendant's Exhibit 3 at 50–51.)

In sum, the court believes that no reasonable jury could conclude that Plaintiff was entitled to or promised a tuition waiver benefit for her daughter. Accordingly, the court will grant Defendant's motion for summary judgment in this regard.

### B. *Emotional Distress*

Defendant's second argument targets Plaintiff's claims of retaliation under Title VII and the ADA, Counts III and IV of her complaint. In essence, Defendant raises the following question for the court's consideration: can Plaintiff claim emotional distress—which she allegedly suffered when her daughter was denied admission to Deerfield Academy—under the retaliation provisions of Title VII and/or the ADA? Defendant suggests that the answer to that question is "no." The court disagrees.

Generally, to establish a *prima facie* case of retaliation under either Title VII or the ADA, a plaintiff must prove that (1) she engaged in protected conduct, (2) she suffered an adverse employment action and (3) a causal connection exists between the two. *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 477–78 (1st Cir.2003) (ADA); *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir.2002) (Title VII). Defendant is willing to assume, for summary judgment purposes, that Plaintiff engaged in protected conduct, *i.e.*, she "complained about the working environment in the kitchen and notified the school that she suffered from [ADD]." (Defendant's Brief at 8 n. 1). *See also Allder v. Daniel O'Connell's Sons*, 20 F.Supp.2d 210, 219 (D.Mass.1998) (complaining to employer constitutes protected activity); *Ruffino v.*

*State Street Bank & Trust Co.*, 908 F.Supp. 1019, 1044 (D.Mass.1995) (internal complaints of sexual harassment constitute protected activity). Defendant is also willing to assume for present purposes that a causal connection exists between *Plaintiff's* protected conduct and the denial of admission to *her daughter.* (Defendant's Brief at 8 n. 1.) Still, Defendant argues, the denial of admission is not an "adverse employment action" directed at Plaintiff and, thus, does not fall within the rubric of Title VII or ADA retaliation.[3]

There are two cases cited by Defendant which lend tangential support to its position. In *Hale v. N. Little Rock Housing Auth.*, 720 F.2d 996 (8th Cir.1983), the plaintiff brought a Title VII action against her former employer and, apparently, also sought to raise a claim regarding the employer's denying her husband a job. Putting aside some confusion about who in fact was the plaintiff's employer, the court noted that the plaintiff herself did "not have standing to complain of any violations of her husband's rights." *Id.* at 998 n. 2. A similar conclusion was reached in *Ghannam v. Regis Corp.*, 1992 WL 118795, at *4 (D.Md. May 15, 1992) ("Plaintiff has no standing to bring a cause of action based on the Defendant's failure to hire her sister."). Here, too, Defendant claims, Plaintiff cannot complain in the context of *her* lawsuit about any violation of her *daughter's* rights, whatever those rights might be.

For her part, Plaintiff relies on an entirely separate set of cases, all of which involve instances where a family member-employee (or prospective employee) was retaliated against because *another* family member-employee engaged in protected

---

**3.** Following the parties' lead, the court construes the Title VII and ADA claims in tandem, even though the majority of caselaw addressed by the parties arises in the Title VII

context. As indicated, the retaliation elements for each cause of action are essentially the same.

conduct. Citing *EEOC v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir.1993), *Gonzalez v. N.Y. State Dep't of Corr. Services*, 122 F.Supp.2d 335 (N.D.N.Y.2000), *Mandia v. ARCO Chem. Co.*, 618 F.Supp. 1248 (W.D.Pa.1985), and *United States v. City of Socorro*, 1976 WL 523 (D.N.M. Jan. 9, 1976), Plaintiff asserts that courts allow the victim to maintain a Title VII action in such circumstances.

The court finds neither line of cases particularly convincing. As for the two decisions upon which Defendant relies, it is clear that Plaintiff is not seeking to vindicate any rights which her daughter may have had against Defendant when it denied her admission. Rather, Plaintiff is seeking damages for the emotional distress she experienced as a result of Defendant's retaliation against Plaintiff which, in Plaintiff's view, includes the denial of admission to her daughter.

The cases cited by Plaintiff are similarly inapposite. First, there is by no means universal recognition of a cause of action for retaliation against a person who has not herself personally engaged in protected conduct, so-called "third party retaliation." If anything, those circuit courts of appeal which have addressed the issue—the First Circuit not amongst them—have specifically declined to recognize such claims. *See, e.g., Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1227 (5th Cir.1996); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir.1998); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 569 (3rd Cir.2002).[4] Second, and more to the point, the case at bar does not present a third-party retaliation claim. Plaintiff's daughter is not mak-

ing a claim against Defendant and there is no allegation that she herself engaged in any activity protected by Title VII or, for that matter, the ADA.

To be sure, Defendant acknowledges, at least for summary judgment purposes, that Plaintiff did suffer an "adverse employment action" when she was terminated after she engaged in protected activity, *i.e.,* complaining about both sexual harassment and inappropriate comments about her disability. *See Kosereis v. Rhode Island,* 331 F.3d 207, 212–13 (1st Cir.2003) (adverse *employment* action against the *employee* is an essential component of the employee-plaintiff's *prima facie* case). Nonetheless, Defendant asserts, Plaintiff did not suffer another "adverse employment action" when her daughter was denied admission to Deerfield. Accordingly, Defendant argues, Plaintiff is not entitled to any emotional distress damages arising out of that denial. In the court's view, the issue is not so simple.

The First Circuit takes a relatively broad view of the type of employment actions which may be considered "adverse." *See White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 262 (1st Cir. 2000) ("Adverse employment actions include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.") (citation and internal quotation marks omitted). *Compare also Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000) ("a wide array of disadvantageous changes in the workplace constitute adverse employment actions"), *with Mattern*

---

4. *See also Higgins v. TJX Cos.,* 328 F.Supp.2d 122, 123–24 (D.Me.2004), which distinguishes the Sixth Circuit's decision, upon which Plaintiff presently relies, *Ohio Edison,* 7 F.3d at 541, because it involved a person engaging in protected conduct *on behalf of* the employee complaining of retaliation. *But see* note, Anita G. Schauster, *Retaliation Against Third Parties: A Potential Loophole in Title VII's Discrimination Protection,* 37 J. Marshall L.Rev. 1313, 1314 (2004) ("propos[ing] that the purpose of Title VII is best served by adopting a broad interpretation of the statutory language to include retaliation claims by third parties").

*v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (only "ultimate employment decisions" can be adverse employment actions), *and Akers v. Alvey,* 338 F.3d 491, 497–98 (6th Cir.2003) (an adverse employment action must involve "a significant change in [the plaintiff's] employment status"). "Typically," the First Circuit recently explained, "an adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay)." *Noviello v. City of Boston,* 398 F.3d 76, 88 (1st Cir.2005). But, the court continued, there may be more "nuanced" acts on the part of an employer that also fall within the bar of the anti-retaliation provision. *Id.* In particular, the court held, "a hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action." *Id.* at 89.

■ To be sure, most retaliatory cases—even in those circuits which define adverse actions broadly—arise from acts affecting the terms and conditions of employment.[5] Nonetheless, as one of these courts has explained, "[t]here is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint." *Knox v. Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996). "The law deliberately does not take a 'laundry list' approach to retaliation," the court explained, "because unfortunately its forms are as varied as the human imagination will permit." *Id.* at 1335. In other words, courts have had little choice but to recognize in appropriate circumstances that anti-retaliation provisions may cover actions that are not directly employment-related.

One example is *Aviles v. Cornell Forge Co.,* 183 F.3d 598 (7th Cir.1999). There, the court held that a false report to the police that an employee was armed and laying in wait outside the plant could be construed by a fact finder as a retaliatory action meant to dissuade that employee from pursuing his claim of a hostile work environment. *Id.* at 606. Relying in part on *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 892 (7th Cir.1996), the court explained that "the language of the Title VII retaliation provision is broad enough to contemplate circumstances where employers might take actions that are not ostensibly employment related against a current employee in retaliation for that employee asserting his Title VII rights." *Id.* Similarly, in *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996), the court determined that the filing of criminal charges against a former employee constituted an adverse employment action. Likewise, the District of Columbia Circuit deemed the cancellation of a major public symposium in an employee's honor to be an adverse employment action because of the public humiliation involved. *See Passer v. American Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991) (holding that parallel provision in the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.,* "does not limit its reach only to acts of retaliation that take the form of cognizable employment actions").

■ Although "the [First] Circuit has never addressed the issue head-on in the context of [a] clearly retaliatory but non-employment-related act," *Dressler v. Daniel,* 2001 WL 1175990, at *1 n. 3 (D.N.H. Sept. 28, 2001), the recognition of more generic acts of retaliation makes eminent sense in view of the statutory language.[6]

---

5. Had Plaintiff been eligible for a tuition waiver for her daughter as part of Plaintiff's benefits package, *see* discussion *supra,* its de-nial likely would have constituted an adverse employment action.

6. In pertinent part, the main language of Title

As the First Circuit recently explained, the term "discriminate" in Title VII's anti-retaliation provision, 42 U.S.C. § 2000e–3(a), appears without the qualifying phrase "to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment,*" which language is present in Title VII's underlying provision, 42 U.S.C. § 2000e–2(a)(1). *Noviello,* 398 F.3d at 90. To be sure, the First Circuit applied to this variation the canon of construction "'that 'a term appearing in several places in a statutory text is generally read the same way each time it appears.' " *Id.* (quoting *Ratzlaf v. United States,* 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)). In this court's estimation, however, the First Circuit did so in order to expand, not limit, the type of retaliatory acts cognizable under Title VII. Indeed, the court explained, its "interpretation of the statutory text is shared by the [Equal Employment Opportunity Commission ("EEOC")], which finds the lack of any qualifier on the term 'discriminate' in the anti-retaliation context to evince a purpose to 'prohibit *any* discrimination that is reasonably likely to deter protected activity." *Id.* (quoting EEOC Compl. Man. (CCH) ¶ 8005, § 8–II.D.3 (2004)) (emphasis added by court).[7]

    In the end, this court believes that the focus at this stage of proceedings, summary judgment, should be on those factual underpinnings which could reasonably support a causal connection between the exercise of an employee's protected conduct and the employer's alleged retaliation, *i.e.,* whether the retaliatory act punishes the employee for engaging in protected conduct or is designed to keep the employee from reporting discrimination. To be sure, the connection here between Plaintiff's exercise of her Title VII rights and Defendant's denial of admission to her daughter appears tenuous and may not be provable at trial. *See Aviles v. Cornell Forge Co.,* 241 F.3d 589, 593 (7th Cir.2001) (finding proof lacking). Nonetheless, there is more than a hint of a temporal relationship, *i.e.,* Plaintiff's daughter was placed on the waiting list (and thereafter denied admission) less than one month after Plaintiff complained that several co-workers had sexually harassed her and made inappropriate comments regarding her ADD. More importantly, Defendant, as indicated, has presumed for present pur-

---

VII states as follows:

> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e–2(a)(1) (emphasis added). The anti-retaliation provision provides, in pertinent part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of this employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

7. As the First Circuit recognized, the EEOC's manual is not binding on the courts. *Id.* However, it does "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citation and internal quotation marks omitted). *See also* Linda M. Glover, *Title VII Section 704(A) Retaliation Claims: Turning a Blind Eye Toward Justice,* 38 Hous. L.Rev. 577, 581 (2001) (arguing that *any* conduct on the part of an employer that chills employee access to the anti-discrimination provisions of Title VII should be made actionable under its anti-retaliation provision).

poses—albeit with a different end in mind—that a causal connection does exist. Indeed, in this regard, Plaintiff offers a note on her daughter's application, dated February 21, 2000, *i.e.*, two days after Plaintiff's termination and five days after Plaintiff complained, which states that Plaintiff "no longer work[ed]" for Defendant. In sum, the court has little choice but to consider Defendant's concession, together with the other evidence proffered, sufficient to get Plaintiff past summary judgment on this issue.

## IV. CONCLUSION

For the reasons stated, Defendant's motion for partial summary judgment is ALLOWED with regard to Plaintiff's claim for damages related to the tuition-waiver benefit, but otherwise DENIED. The clerk is directed to schedule the matter for a case management conference.

IT IS SO ORDERED.